STATE OF NEBRASKA, APPELLEE, v. JOSEPH PATTERSON, ALSO KNOWN AS JOE THOMAS, APPELLANT.
STATE OF NEBRASKA, APPELLEE, v. CHARLES WALKER, APPELLANT.
220 N. W. 2d 235

Filed July 18, 1974. Nos. 39182, 39205.

J. Bruce Teichman, for appellants.

Clarence A. H. Meyer, Attorney General, and Ralph H. Gillan, for appellee.

Heard before SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

CLINTON, J.

The principal question involved on these appeals is whether without a warrant the entry and search of an apartment where the crime of possessing a controlled

substance, heroin, with intent to deliver, distribute, or dispense, was being committed and where the arrests on the charge took place, were lawful because justified by the circumstances and therefore not unreasonable. Upon this determination rests the correctness of the decision of the lower court in denying suppression of the physical evidence seized during the search.

On March 27, 1973, about 2 o'clock p.m., pursuant to information received by telephone from the owner of the building in question, officers of the Omaha police department made an investigation of the exterior of the premises, including driveway and trash cans, and there found a large quantity (two or three hundred) of empty red capsules of the type in which dosages of medicine are enclosed, as well as a number of broken and empty, unbroken bottles (72-capsule size) bearing Dormin labels, an empty aluminum foil box and spool, some squares of aluminum foil of about 2-inch by 2-inch dimension, and a brown paper sack containing traces of white powder, preliminary test of which was positive for heroin. Dormin is a nonprescription sleeping tablet and police officers knew from their previous experience that the substance is used by dealers in illegal drugs as a cutting and diluting agent for heroin. Information received from the landlord indicated that the building (formerly a large, one family residence) contained five apartments. One of these apartments, No. 4, had been leased to Pamela Chatmon on March 21, 1973. The officers knew Pamela Chatmon as one involved in drug-related activities. The landlord attributed to the occupant or occupants of apartment No. 4 the items the officers had found because he had not observed such items on the premises except after March 21, 1973.

Apartment No. 5 of the building was empty. It was adjacent to apartment No. 4 and there was a wall common to both apartments. The police department then leased apartment No. 5 and began a surveillance of

apartment No. 4 by listening to the noises and conversations. No listening devices were used. This surveillance began some time in the afternoon of March 27, 1973, and continued until about 2:30 p.m. on March 28th when apartment No. 4 was entered by police officers and the two defendants herein, Patterson (alias Thomas) and Walker, were arrested along with seven other persons. Seized were 1,005 "hits" of heroin, packaged and bagged, and certain other physical evidence used in the preparational process. With the use of this evidence and the testimony of one of the arrestees, the two defendants were found guilty by a jury and sentenced to terms of 15 and 10 years, respectively, in the Nebraska Penal and Correctional Complex.

During the course of the surveillance some of the officers periodically left the apartment and made telephone reports to the officer supervising the investigation. The first hours of surveillance yielded no information. Apparently there was no one in apartment No. 4. At about 1:30 a.m. on March 28, 1973, some persons entered the apartment and the officers, basing their judgment on the voices heard, determined the persons to be both male and female and in number about five. The parties appeared to be playing a game such as scrabble. At about 2:30 a.m. one of the males left, stating that he was going to find out "whats coming off." Thereafter fragments of conversation between one man and two women were heard. The names Howard, Joe, and Violet, apparently referring to persons not present, were used. Joe apparently was a main subject of conversation and concern was expressed about the manner in which he was conducting his business. It was apparent from the conversation that he was expected to show up at the apartment but had not done so. At about 3:30 a.m. the remaining male left the apartment. After this one of the women was heard to say: "If Joe don't show up pretty soon we gonna

have to clean his stuff off the table before the telephone man comes."

The name, Joe, led police to believe that the defendant Thomas was referred to. He was thought by police, based upon previous information which they had, to be a person responsible for bringing heroin into Omaha. The name, Howard, was believed to refer to a person of that name who was a "bag man" for "Glasses" Jones, a convicted drug dealer who was free pending an appeal of his conviction in the federal court. At about 9 a.m. on March 28, 1973, Jones' car was observed parked in the immediate neighborhood.

At about 9 o'clock a.m. also, a police officer at police headquarters, furnished with the information thus far gathered and using background information from the police files, began preparing an affidavit for a search warrant. At about 11 a.m. the officers in apartment No. 5 overheard a male voice saying: " 'Joe told me to stop over, he's on his — he's going to go find Glasses.' " The police, because of their knowledge of Joe and Glasses, believed that one of them would deliver heroin to the apartment to be mixed, measured into hits, packaged, and then bagged. At about this same time there was conversation concerning Dormin and sounds which the officer interpreted as being those of the process of Dormin being prepared for mixing. At this time those supervising the investigation and the officers conducting the surveillance apparently had no reason to believe that Joe or Glasses were in the apartment or that heroin had already been delivered.

At police headquarters the affidavit was being drafted and between 12 and 12:30 p.m. there was a conference with one of the staff of the county attorney's office relative to the sufficiency of the information therein contained. No definitive stand was taken by either the county attorney's office or the police department, but

apparently it was thought that they needed some evidence that the drug itself was in the apartment.

At about 2 o'clock p.m. the officers in apartment No. 5 heard: "Look at all the dope on the table," and "Let's get to bagging up." Other scraps of conversation were heard which indicated to officers that the persons in the apartment were getting ready to depart.

The above developments led the officers in apartment No. 5 and the officer in charge of the investigation to whom the information had been relayed at about 2:15 p.m., that at that time, contrary to their previous expectations, the heroin was there; that the mixing of the heroin and Dormin, its division into hits, and its packaging had already taken place; and that all that remained to be done was the bagging which would not take very long.

The latest information had not yet been incorporated in the affidavit and it was estimated it would take 1 hour and 15 minutes to get the warrant. The officer in charge made the decision to enter the premises without a warrant while the apartment was still occupied.

The position of the defendants is that the State had ample time to procure a warrant prior to the entry and search because as much as 24 hours prior to the search they had probable cause to obtain a warrant and could easily have done so. They further assert that in any event the State had sufficient probable cause to obtain a warrant at about noon the day following when the officers heard noises which they interpreted as being part of the preparation process. They argue, therefore, that any exigent circumstances which arose were the creation of the officers and the prosecutors themselves in not analyzing their information more quickly and acting more efficiently in the preparation of the affidavit for the warrant. They cite Chimel v. California, 395 U. S. 752; 89 S. Ct. 2034, 23 L. Ed. 2d 685; United States v. Ventresca, 380 U. S. 102, 85 S.

Ct. 741, 13 L. Ed. 2d 684; Rugendorf v. United States, 376 U. S. 528, 84 S. Ct. 825, 11 L. Ed. 2d 887; United States v. Harris, 403 U. S. 573, 91 S. Ct. 2075, 29 L. Ed. 2d 723; McDonald v. United States, 335 U. S. 451, 69 S. Ct. 191, 93 L. Ed. 153; and Vale v. Louisiana, 399 U. S. 30, 90 S. Ct. 1969, 26 L. Ed. 2d 409.

From the standpoint of legal theory, the defendants take the position that where it is possible to get a warrant no circumstance can justify a search without one. This position essentially states one side of a controversy which has long raged over the meaning of the Fourth Amendment and which the Supreme Court of the United States has itself been unable to decisively resolve. That court has recently summarized that controversy in the case of Coolidge v. New Hampshire, 403 U. S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564, in the following language: "Much the most important part of the conflict that has been so notable in this Court's attempts over a hundred years to develop a coherent body of Fourth Amendment law has been caused by disagreement over the importance of requiring law enforcement officers to secure warrants. Some have argued that a determination by a magistrate of probable cause as a precondition of any search or seizure is so essential that the Fourth Amendment is violated whenever the police might reasonably have obtained a warrant but failed to do so. Others have argued with equal force that a test of reasonableness, applied after the fact of search or seizure when the police attempt to introduce the fruits in evidence, affords ample safeguard for the rights in question, so that '[t]he relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable.'

"Both sides to the controversy appear to recognize a distinction between searches and seizures that take place on a man's property—his home or office—and those carried out elsewhere. It is accepted, at least as a

matter of principle, that a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.'"

The power to search without a warrant is rooted in the common law. Weeks v. United States, 232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652. A tracing of the history of the development of the law through the irregular traverses of the opinions of the Supreme Court of the United States demonstrates the difficulty of drawing any sharply defined and regular line and of placing a given set of facts on one side or the other of that line. The recent history may be traced in the following cases. Marron v. United States, 275 U. S. 192, 48 S. Ct. 74, 72 L. Ed. 231 (1927); United States v. Lefkowitz, 285 U. S. 452, 52 S. Ct. 420, 76 L. Ed. 877 (1932); Harris v. United States, 331 U. S. 145, 67 S. Ct. 1098, 91 L. Ed. 1399 (1947); Trupiano v. United States, 334 U. S. 699, 68 S. Ct. 1229, 92 L. Ed. 1663 (1948); United States v. Rabinowitz, 339 U. S. 56, 70 S. Ct. 430, 94 L. Ed. 653 (1950), overruling Trupiano; Kremen v. United States, 353 U. S. 346, 77 S. Ct. 828, 1 L. Ed. 2d 876 (1957); Abel v. United States, 362 U. S. 217, 80 S. Ct. 683, 4 L. Ed. 2d 668 (1960); Chapman v. United States, 365 U. S. 610, 81 S. Ct. 776, 5 L. Ed. 2d 828 (1961); Ker v. California, 374 U. S. 23, 83 S. Ct. 1623, 10 L. Ed. 2d 726 (1963); James v. Louisiana, 382 U. S. 36, 86 S. Ct. 151, 15 L. Ed. 2d 30 (1965); Shipley v. California, 395 U. S. 818, 89 S. Ct. 2053, 23 L. Ed. 2d 732 (1969); Warden v. Hayden, 387 U. S. 294, 87 S. Ct. 1642, 18 L. Ed. 2d 782 (1967); Chimel v. California, *supra* (1969); Vale v. Louisiana, *supra* (1970).

The position of the defendants overlooks the obvious fact that if an entry had been made, even with a warrant, prior to the time the heroin was on the premises the whole operation would have been fruitless as far

as law enforcement is concerned. The police were fully justified in waiting until they had information which indicated the heroin was on the premises before they completed the affidavit. The fact that when that information was obtained, contrary to the prior expectations of the police, it also developed that the packaging process was practically complete and the occupants were preparing to depart and that it still would take about 1 hour and 15 minutes to obtain the warrant did not materially change the officers' position as far as the applicable rules are concerned. It seems clear to us that exigent circumstances did then exist and that these justified the entry without a warrant. Those circumstances were not rendered less exigent by the fact that the officers could have been less exacting in the preparation of the affidavit or that a skilled stenographer might have been used to type the affidavit rather than a police officer.

The exigency arose because of the probability of the destruction of the evidence before the warrant could have been obtained. The officers could not count on the possibility that all the occupants would leave the premises at one time so that they could be arrested en masse outside the premises. If the individuals had left separately the arrest of the first would have alerted those staying behind who then could have rather readily, with the many hands available to do the work, washed the heroin down the sinks and toilet. The evidence was safe only so long as the operation remained undetected.

The above exigent circumstances accompanied by the following factors made the search reasonable: (1) The information that the officers had obtained indicated with certainty that the crime was actually in progress on the premises. (2) There existed probable cause for both arrest and search. (3) The arrest and search were substantially contemporaneous and the arrest took place

on the premises where the crime was committed, not away from it as in some of the cases cited by the defendants. (4) The evidence seized consisted solely of the contraband heroin mixture and the instrumentalities used in its preparation. (5) The search was appropriately limited and there was no general ransacking of the premises.

In arriving at our conclusions we rely upon the following authorities: Ker v. California, *supra;* Warden v. Hayden, *supra;* Abel v. United States, *supra;* James v. Louisiana, *supra;* and United States v. Rubin, 474 F. 2d 262. In the last case the Third Circuit approved a search under circumstances similar to those here involved. The circumstances in this case are almost identical with those involved in the search of the Alba residence in Agnello v. United States, 269 U. S. 20, 46 S. Ct. 4, 70 L. Ed. 145, 51 A. L. R. 409, where the lawfulness of that particular search was not even questioned.

Without attempting to draw any precise line, we hold: (1) A search of a place of residence without a warrant is not justified under the Fourth Amendment in the absence of probable cause and exigent circumstances, or some other recognized exception. (2) Where the information in the possession of the officers leads to the conclusion that the place of residence is the scene where a felony is being committed and they have evidence which indicates that this is the fact and where there is great likelihood that the evidence will be destroyed or removed before a warrant can be obtained, then exigent circumstances may be said to exist. (3) Search pursuant to warrant is to be much preferred to search without a warrant and ordinarily a warrant should be obtained. The trial court was clearly correct in not suppressing the evidence.

With reference to the sufficiency of the evidence, it is clear the facts we have set forth and the testimony

of the accomplice directly implicating the defendants were sufficient to support the verdict.

In connection with the 15-year sentence of Patterson, another issue is raised. L.B. 261, Laws 1973, amended section 28-4,125, R. S. Supp., 1972, to reduce the penalty for the crime with which appellants were charged from a period of not less than 5 years nor more than 20 years to a period of not less than 1 year nor more than 10 years.

This sentence, of course, was proper at the time it was imposed on June 12, 1973, since L.B. 261 was not then in effect. However, this court has held in State v. Randolph, 186 Neb. 297, 183 N. W. 2d 225, and a number of subsequent cases, that where a criminal statute is amended by mitigating the punishment, after the commission of the crime, but before final judgment, the punishment is that provided in the amendatory act unless the Legislature has specifically provided otherwise.

In light of these cases, Patterson's sentence is now excessive and he must be resentenced.

Judgment and sentence in No. 39205 are affirmed. The judgment in No. 39182 is affirmed, the 15-year sentence is vacated, and the cause remanded for resentencing.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED.