Joseph THOMAS, a/k/a Joseph
Patterson, Appellant,

v.

Robert PARETT, Acting Warden of the
Nebraska Penal and Correctional
Complex, Appellee.

Charles WALKER, Appellant,

v.

Robert PARETT, Acting Warden of the
Nebraska Penal and Correctional
Complex, Appellee.

Nos. 75–1098, 75–1131.

United States Court of Appeals,
Eighth Circuit.

Submitted May 16, 1975.

Decided Sept. 9, 1975.

As Modified On Denial of Rehearings
and Rehearings En Banc
Sept. 29, 1975.

John William Gallup, Omaha, Neb., for
appellant.

Ralph H. Gillan, Asst. Atty. Gen., Lincoln, Neb., for appellee.

Before MATTHES, Senior Circuit Judge, LAY, Circuit Judge, and REGAN, District Judge.[*]

REGAN, District Judge.

These appeals from orders dismissing petitions for writs of habeas corpus challenge the validity of the warrantless search of an apartment during which certain crucial physical evidence was seized.[1] The reasonableness of the search itself is not otherwise in question.

Petitioners, jointly tried in the district court of Douglas County, Nebraska, were convicted of possession of heroin with intent to deliver. The convictions were affirmed by the Supreme Court of Nebraska. *State v. Patterson*, 192 Neb. 308, 220 N.W.2d 235 (1974). Having exhausted their state remedies, petitioners separately petitioned for federal habeas corpus, asserting the same grounds ad-

---

[*] JOHN K. REGAN, United States District Judge, Eastern District of Missouri, sitting by designation.

1. Four justices of the Supreme Court have expressed the opinion that "federal collateral review of a state prisoner's Fourth Amendment claims—claims which rarely bear on innocence—should be confined solely to the question of whether the petitioner was provided a fair opportunity to raise and have adjudicated the question in state courts." *See Schneckloth v. Bustamonte*, 412 U.S. 218, 249, 250, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973). More recently in *Cardwell v. Lewis*, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974), both the plurality and dissenting opinions mentioned this issue but refrained from considering it solely because it was neither briefed nor argued by the parties.

versely ruled by the state court. The district court, Judge Albert G. Schatz, upon a consideration of the evidence adduced in the state court proceeding, ruled that the search was lawful because it was justified by the circumstances. We agree.

The relevant facts are basically undisputed. On the afternoon of March 27, 1973, the owner of a five-apartment building in Omaha, Nebraska, alerted the police to the presence at the rear of the building of a number of items, including empty aluminum foil containers and some 2 x 2 inch squares of aluminum foil, several hundred empty red capsules of the type in which doses of medicine are enclosed, and a number of bottles containing the label of Dormin, a non-prescription sleeping tablet which is commonly used as an agent for cutting and diluting heroin. Also found by the police at that time was a brown paper sack containing traces of white powder which, when preliminarily tested later that day, was positive for heroin. The landlord informed the police that he had not observed such items prior to March 21, 1973, when he rented apartment No. 4 to a Pamela Chatman, known to the police to be involved in drug-related activities.

The building, which had been converted from a single family residence, had two apartments on the first floor, No. 4 and No. 5. Apartment No. 5 (then vacant) was located immediately to the rear of No. 4 and separated from it by a common wall. The entrance to apartment No. 4 was the front door of the building, while apartment No. 5 could be entered only through the rear side door. The police, determined to conduct an around-the-clock surveillance of the Chatman apartment, rented apartment No. 5 about 4 P.M. on March 27. From that apartment they were able to listen (without the aid of any listening devices) to the noises and conversations emanating from the Chatman apartment, but could not see its door. During the course of their surveillance one of the officers would periodically leave the apartment and make a telephone report from a pay telephone at a service station on the corner to the officer supervising the operation.

So far as the police were then aware, there was nobody in apartment No. 4 during the first hours of the surveillance. At about 1:30 A.M. on March 28, they heard voices which indicated to them that about five persons (both male and female) had entered the apartment. About an hour later, one of the males departed. Conversations between a man and two women in the apartment referred to several persons, apparently not present, including a "Howard" and a "Joe." Joe was the main subject of conversation, and concern was expressed about his failure to show up. Howard was thought by the police to refer to a "bag man" for "Glasses" Jones, a convicted drug dealer who was free on bond, and Joe was believed to refer to petitioner Thomas (known to the police as Patterson), who they had reason to believe was a person responsible for bringing heroin into Omaha. Jones' car was observed parked in the immediate neighborhood.

At about 11 A.M., the officers overheard statements which led them to believe that either Joe or "Glasses" would later deliver the heroin to the apartment, to be mixed, measured into "hits," packaged, and then bagged. There was conversation and a chopping noise indicating that Dormin was already being prepared for mixing. However, there was then no reason for the officers to believe that either Joe or "Glasses" was in the apartment or that heroin had already been delivered. Testimony at the trial was to the effect that Joe (petitioner Thomas) had brought the heroin to the apartment at noon. The police had no knowledge of this fact.

At about 2 P.M., one of the persons in the apartment was overheard to say "Look at all that dope on the table. Let's get to bagging up." The reference to "bagging" indicated to police that the heroin had already been cut and packaged in individual square aluminum foil packets, called "hits," and that the only

remaining thing to be done was to place a number of "hits" in plastic bags (a procedure which would take a few minutes). Also overheard at that time were scraps of conversation relating to rides, preparatory to the occupants leaving the apartment. At 2:15 P.M., headquarters was notified of the latest development, and shortly thereafter, on the assumption there would be insufficient time to obtain a warrant, the apartment was raided.[2] In the ensuing search, heroin in foil packets was found which were used as evidence against petitioners.

There can be no question but that police had intended to procure a search warrant. As early as 9 A.M. on March 28, an officer at police headquarters began the preparation of an affidavit on the basis of the information available at that time, including some background information from police files. During the noon hour, a draft of the affidavit was submitted to a staff member of the County Attorney's office to determine whether the facts set forth justified presenting it to a judge in an effort to obtain a search warrant. The conclusion reached was that a search warrant should not be applied for until there was some evidence to support a reasonable belief that heroin was then in the apartment. However, as we have noted, it was not until the 2 P.M. development that the police for the first time had reason to believe that heroin was actually there, and at that time it also appeared that the heroin had already been mixed with Dormin, divided into "hits" and packaged. To have incorporated this information into the affidavit and then presented it to a magistrate would have taken substantially more than an hour's time. Confronted with the indications of an impending departure from the apartment, the officer in charge decided that the premises should be entered without waiting for a warrant.

Was the warrantless search justified by the presence of "exigent circumstances"? We hold that it was. In none of the morning conversations had there been any direct reference to the presence of drugs, and it was clearly indicated that the occupants were waiting for the later arrival of the person who was to deliver narcotics. The police are not to be faulted for their failure to seek a warrant before 2 P.M. solely on the basis of suspicious circumstances which indicated at most no more than the probability that heroin had recently been in the apartment premises and that at some time in the immediate future more heroin would be brought there and prepared for street sale. The information available to the officers prior to 2 P.M. was not sufficient to support a belief that narcotics were already in the apartment. In our judgment, the police were justified in waiting until additional facts were developed.

The situation in this case is wholly unlike that in *United States v. Wilcox*, D.C.Pa., 357 F.Supp. 514 (1973), in which the officers were in full possession of all probable cause knowledge at least an hour and a half before the warrantless search, and had ample time during that period to have procured a warrant. As the District Court observed, this is not a case where the officers deliberately delayed in order to circumvent the necessity to obtain a warrant (as in *Niro v. United States*, 388 F.2d 535 (1st Cir. 1968), or where a warrant was not obtained because it would be inconvenient for the police to apply for one (as in *United States v. Scheffer*, 463 F.2d 567 (5th Cir. 1972). *Cf. Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948),[3] in which the only reason of-

---

2. Nine persons in the apartment were arrested.

3. In view of the statement in the dissenting opinion that *Johnson* controls this case, a few additional comments are apropos: It is, of course obvious, as the officers testified, that there was no danger that the contraband in the apartment would be *destroyed* as long as they were not discovered. However, it is equally obvious to us that the officers were justified in believing not only that the heroin was *soon* to be removed but that such removal was *imminent*, even though those in the apartment had no knowledge of the officers' presence.

*Johnson* does not involve comparable facts. In *Johnson*, time was not of the essence, and

fered for not obtaining a warrant after the officers smelled odors of opium emanating from a hotel room was the "inconvenience to the officers and some slight delay necessary to prepare the papers and present the evidence to a magistrate." In that case no suspect was likely to take flight nor was there any evidence or contraband threatened with removal from the premises.

The good faith of the officers is evident. Even so, the Fourth Amendment mandates that a search without a warrant is impermissible absent the existence of exigent circumstances or some other recognized exception. *Coolidge v. New Hampshire*, 403 U.S. 443, 474–475, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Nieto*, 510 F.2d 1118, 1119 (5th Cir. 1975). *Cf. United States v. Blake*, 484 F.2d 50 (8th Cir. 1973); *United States v. Curran*, 498 F.2d 30, 35 (9th Cir. 1974); and *United States v. Rubin*, 474 F.2d 262 (3d Cir. 1973).

In our judgment the finding of exigent circumstances is amply supported by the evidence. As the Nebraska Supreme Court observed (220 N.W.2d, l.c. 240):

> The exigency arose because of the probability of the destruction of the evidence before the warrant could have been obtained. The officers could not count on the possibility that all the occupants would leave the premises at one time so that they could be arrested en masse outside the premises. If the individuals had left

there was no reason to believe that the situation would be any different if the raid was deferred until a warrant was issued. Here, as distinguished from *Johnson*, the officers had information that long before a warrant could have been obtained (1) the suspects were likely to take flight (i. e. depart from the apartment) and (2) that "the contraband was threatened with removal" from the premises. The heroin had already been prepared and packaged for distribution outside the apartment. Under the facts in this case, to hold that a warrantless search would be justified only "(i)f too many suspects began to leave simultaneously or over a short period of time"

separately the arrest of the first would have alerted those staying behind who then could have rather readily, with the many hands available to do the work, wash the heroin down the sinks and toilet.[4] The evidence was safe only so long as the operation remained undetected.

Appellants' reliance on *Eng Fung Jem v. United States*, 281 F.2d 803 (9th Cir. 1960), is misplaced. That case involved the entry into the defendant's hotel room at a time when no one was present therein. As the Court there noted, the mere fact that defendant may have been planning to vacate the room and leave town did not justify the warrantless entry, for the reason that the officers could have prevented the destruction or removal of the contraband from the *unoccupied* room by merely guarding the door pending the procurement of a warrant. Here, there was no way the police could have prevented any of the nine occupants of the apartment from destroying the heroin before a warrant could have been obtained.

The orders appealed from are affirmed.

LAY, Circuit Judge (dissenting).

I respectfully dissent.

I would set aside the search and seizure as illegal in the absence of the issuance of a valid search warrant.

The majority view is based entirely upon a subjective evaluation by police officers to justify a warrantless search. Judicial approval of subjective standards to appraise a search and seizure under

(dissenting opinion, page 786), is to ignore reality and place too great a reliance on speculative possibilities. Inasmuch as the evidence clearly warranted the officers' belief that all of the suspects intended to and would leave either "simultaneously or over a short period of time," long before a warrant could have been issued, we are convinced the officers were justified in acting upon such reasonable belief.

4. The police had been informed by the landlord that apartment No. 4 had a toilet and other plumbing facilities. [Footnote not in quotation.]

the Fourth Amendment lends confusion and uncertainty to the practical realities law enforcement officers face in day to day encounters. Writing in dissent in *United States v. Cummings*, 507 F.2d 324, 333 (8th Cir. 1974), I observed:

It is of fundamental importance, if the rights guaranteed by the Fourth Amendment are to remain inviolate, that law enforcement officials fully comprehend the line of demarcation between a legal and an illegal search. Magistrates, unless they profess to be a mere conduit for issuance of illegal warrants, must be able to easily discern the legal requirements of probable cause. This will never occur as long as we premise lawful searches on quantitative standards which turn only on the subjective analysis of these officials.

The basic premise from which an analysis of any search and seizure must proceed is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (footnotes omitted). The exceptions which do exist are to be "jealously and carefully drawn", and "the burden is on those seeking the exemption to show the need for [the warrantless search]." *See Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (footnotes omitted).

This case is controlled by *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). In *Johnson*, officers who smelled burning opium in a hotel corridor were not permitted to enter the room without a warrant. The Court succinctly observed:

The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

*Id.* at 13–14, 68 S.Ct. at 369.

There, as here, known suspects were within the room and drugs were obviously present. The Court was unimpressed by the exigency argument used there. It said:

There are exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with. But this is not such a case. No reason is offered for not obtaining a search warrant except the inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate. These are never very convincing reasons and, in these circumstances, certainly are not enough to by-pass the constitutional requirement. No suspect was fleeing or likely to take flight. The search was of permanent premises, not of a movable vehicle. No evidence or con-

traband was threatened with removal or destruction, except perhaps the fumes which we suppose in time would disappear. But they were not capable at any time of being reduced to possession for presentation to court. The evidence of their existence before the search was adequate and the testimony of the officers to that effect would not perish from the delay of getting a warrant.

*Id.* at 14–15, 68 S.Ct. at 369.

The Court further observed:

If the officers in this case were excused from the constitutional duty of presenting their evidence to a magistrate, it is difficult to think of a case in which it should be required.

*Id.* at 15, 68 S.Ct. at 369.

In the present case, the state's argument that the officers believed there was a likelihood of imminent removal of the heroin does not withstand either factual or legal analysis.

The record shows that it was not the officers at the scene who made the determination that they were confronted with an emergency. The officer in charge of the "on the scene" surveillance relayed the new information (the presence of heroin) to Lt. Swanson at headquarters at 2:15 p. m. It was Lt. Swanson, who was *not even on the scene,* who made the determination that an emergency existed and that there was not time to obtain a warrant. In effect, the court is permitting the judgment of Lt. Swanson to supplant that of a neutral and detached magistrate. It is of critical importance here that the officers at the scene testified that as long as they were not discovered, there was no reason for concern that the drugs in the apartment would be destroyed before they could get a warrant. These facts clearly demonstrate the warrantless search to be outside the parameters of the Fourth Amendment.

Second, under the majority's approach to "exigency," whenever a police officer testified that he reasonably believed that there were mere "indications of an impending departure" and that contraband might be removed, a warrantless search would be justified. Surely more is required to avoid making the Fourth Amendment's search warrant requirement a facade.

There were viable alternatives available to the police officers in the present case which preclude an *objective* finding of an emergency. As in *United States v. Jeffers,* 342 U.S. 48, 52, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951), the officers "could have easily prevented any such destruction or removal by merely guarding the door. Instead, in entering the room and making the search for the sole purpose of seizing respondent's narcotics, the officers not only proceeded without a warrant or other legal authority, but their intrusion was conducted surreptitiously and by means denounced as criminal."

In *McDonald v. United States,* 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948), Mr. Justice Douglas wrote:

We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.

The exceptions to the warrant requirement on which the state relies here were set out by the Supreme Court in *Vale v. Louisiana,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). There, the Court listed among exceptions to the warrant requirement those instances when the goods ultimately to be seized are *in the process of destruction,* or are *about to be moved from the jurisdiction. See id.* at 35, 90 S.Ct. at 1972. The Supreme Court qualified the "destruction" exception by stating that the goods had to be "in the process of destruction".[1] *Id.* The Third

---

1. The Court cited three cases for this exception. First, in *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the evidence was alcohol in the blood. Although the evidence fits within the "in the process of destruction" qualification, the decision was stated in terms of "threatened destruction." *Id.* at 770, 86 S.Ct. 1826. The

Circuit in a well analyzed opinion found that the Supreme Court did not require that "officers have knowledge that evidence is actually being removed. or destroyed." *United States v. Rubin*, 474 F.2d 262, 266 (3rd Cir. 1973); *accord United States v. Rosselli*, 506 F.2d 627, 630 (7th Cir. 1974). *See also* Note, *Police Practices and the Threatened Destruction of Tangible Evidence*, 84 Harv.L. Rev. 1465, 1468 (1971). In *Rubin*, the court articulated a standard by which government action in undertaking a warrantless search may be tested:

> When Government agents, however, have probable cause to believe contraband is present and, in addition, based on the surrounding circumstances or the information at hand, they *reasonably* conclude that the evidence will be destroyed or removed before they can secure a search warrant, a warrantless search is justified.

474 F.2d at 268 (emphasis added).

Relevant circumstances which can be used to determine the existence of an emergency situation are:

> (1) [T]he degree of urgency involved and the amount of time necessary to obtain a warrant, . . . (2) reasonable belief that the contraband is about to be removed, . . . (3) the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought, . . . (4) information indicating the possessors of the contraband are aware that the police are on their trail, . . . and (5) the ready destructibility of the contraband and the knowledge "that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic."

*Id.* at 268–69 (citations omitted).

Analysis of these factors militates against a finding of exigency in the present case.

The first consideration, the degree of urgency involved and the amount of time necessary to obtain a warrant, is a highly subjective matter. If the degree of urgency is given too much weight, the purpose of having a "neutral and detached magistrate" review the existence of probable cause to search may be frustrated. Surely no one would deny that the officers at the scene feel considerably more urgency, due to the proximity of the circumstances. It is for precisely that reason that the Fourth Amendment requires review of the need to search by one not involved in the task of detecting and discovering unlawful activity. To this extent the "urgency" discussed in *Rubin* is a reminder that the need for a warrant is not to be attenuated by the *mere possibility* that the contraband might be removed or destroyed. Thus, under *Rubin*, the minimum criterion must be the urgency of the situation in light of the length of time necessary to obtain a warrant. In order to determine the urgency of the situation (or, differently stated, the imminence of the threatened removal and/or destruction) we must look to the other factors outlined in *Rubin*.

There appears to have been a reasonable belief on the part of the surveilling officers that the heroin was soon to be removed since the officers apparently knew that the "bagging up" process was a final step in the preparation of heroin for street sale. But the question of *imminent* removal of the contraband is less clear. In *United States v. Blake*, 484 F.2d 50 (8th Cir. 1973), and *United States v. Evans*, 481 F.2d 990 (9th Cir. 1973), the courts found that there were "exigent circumstances," that is, reasonable grounds for belief that the evidence would be removed or destroyed if the officers left to obtain a search warrant. In those cases, however, the suspects *knew* of the officers' presence and their desire to search for the suspected contra-

---

second case cited was *United States v. Jeffers*, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951), which spoke in terms of "imminent" destruction. *Id.* at 51, 72 S.Ct. 93. The third case cited in *Vale* was *McDonald v. United States*, 335 U.S. 451, 455, 69 S.Ct. 191, 93 L.Ed. 153

(1948), in which the Court stated that the evidence to be searched for was not in the process of destruction nor as likely to be destroyed as drug paraphernalia in *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

band. The suspects' awareness in those cases is a compelling distinction when one attempts to determine the imminence of removal or destruction of the contraband. Also, in both *Blake* and *Evans* there were confederates or friends who might have removed or destroyed the contraband, even if the suspect was detained while the warrant was sought. See also *United States v. Curran*, 498 F.2d 30 (9th Cir. 1974). Nevertheless, even in *Blake* this court distinguished between "imminent" and "possible" removal or destruction:

> [T]here was not a possible partisan who *might* conceal evidence, but a defendant who *had* attempted to conceal evidence. In short, this case presents the situation, viewed as an exceptional circumstance, in which imminent, not *possible*, removal or destruction . . . existed.

484 F.2d at 56.

Thus, the weight of this factor is reduced by the facts that the occupants of the Chatman apartment did not know the officers were present and further, that the occupants had not attempted to remove the drugs.

It is true that the contraband, heroin, was readily destructible and that the suspects would probably have tried to destroy it if the stake-out had been discovered. However, the same can be said anytime the contraband to be seized is narcotics. Therefore, care should be taken before placing too much emphasis on the ready destructibility of the narcotics. To do otherwise would make the exception inclusive of all narcotics cases. Since the officers admitted that there was no reason here to fear destruction the state must rely solely on the allegedly imminent *removal* of the contraband to justify this warrantless search.

In *United States v. Rosselli*, 506 F.2d 627 (7th Cir. 1974), an apparent girl friend of the defendant's brother was present when the brother was arrested. The asserted justification for the warrantless search of the defendant's apartment was the risk that the girl friend might telephone a warning to the defendant. The *Rosselli* court stated that "if the risk of such a call created an apparent emergency, it could have been avoided by leaving an agent with [the girl friend] while a warrant was being secured." *Id.* at 629. That court further stated that the case was distinguishable from *Rubin* in that in *Rubin* the officers had no opportunity to avoid the critical emergency which developed. The court went on to point out:

> In this case, the evidence does not adequately explain why no attempt to obtain a warrant was made, or why no consideration was given to placing the defendant's apartment under surveillance while an attempt to secure a warrant was being made. Had defendant sought to leave during such a period, he could have been arrested forthwith; and prior to the knock at the door a conclusion that marijuana was being destroyed could not have been justified.

*Id.* at 630. (footnotes omitted).

Whether there was a likelihood of imminent removal of the heroin and its impact on the advisability of continuing the surveillance while waiting for the warrant is more problematical. As noted above, the imminence of removal is less than clear. Even assuming that imminent removal of some of the heroin was virtually assured, however, the matter is not settled. Had any of the occupants sought to leave the apartment while the warrant was being sought, there were enough officers to detain them quietly and far enough from the apartment so as not to alert the remaining confederates. *See United States v. Rosselli*, 506 F.2d 627, 630 (7th Cir. 1974). If too many suspects began to leave simultaneously or over a short period of time, then a clearly more exigent circumstance would have presented itself, and the officers would have been justified in making the desired search at that time. *See United States v. Curran*, 498 F.2d 30, 35 (9th Cir. 1974). *See also United States v. Bozada*, 473 F.2d 389, 393 (8th Cir. 1973) (dissenting opinion).

It is regrettable and yet understandable that law enforcement officials resent judicial interference with otherwise lawful convictions of wrongdoers. It is difficult to write an opinion which allows the guilty to go free. Nonetheless, Fourth Amendment rights of our citizens should not be secondary or collateral to other rights. Justice Powell's approach in *Schneckloth v. Bustamonte*, 412 U.S. 218, 250, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (concurring opinion), alluded to by the majority, requires federal collateral relief to turn only on the color of innocence, and that might indeed lessen tensions between the federal and state judiciaries. Acceptance of that approach, however, requires us to sacrifice the uniform application of our federal Constitution dictated by the Supremacy Clause and run the strong risk that federal rights will once again suffer if left in state hands.[2]

I would reverse and grant habeas relief.

---

**2.** I have previously set forth my opposition to such a proposal:

Requiring a colorable showing of innocence will not vindicate this right. While the protection of the unaccused finds its form in the deterrent aspect of the rule, the vindication of the right of the accused can be achieved only by exclusion of the illegally secured evidence. Deterrence as to him comes too late. The damage has already been done. Yet, it is argued, the "damage" yielded reliable evidence which proves his guilt. Query is made, "Does the convicted felon then deserve to have vindicated a right of privacy which served only to conceal evidence of his crime?" The argument has appeal—if the end justifies the means. In effect we are told to ignore the fourth amendment guarantees whenever they are extended to the "obnoxious" individual. However, the dignity of each individual must remain of equal importance under a government such as ours, or the dignity of all is endangered. *Mapp v. Ohio* tells us that the "right of privacy [is] no less important than any other right carefully and particularly reserved to the people . . . [that this right promotes] principles of humanity and civil liberty," and the fourth and fifth amendments express " 'supplementing phases of the same constitutional purpose—to maintain inviolate large areas of personal privacy.' " More particularly as to the right of the accused, *Mapp* emphasized that:

"The philosophy of each Amendment and of each freedom is complementary to, although not dependent upon, that of the other in its sphere of influence—the very least that together they assure in either sphere is that *no man is to be convicted on unconstitutional evidence* . . . ."

This purpose remains true even in collateral attack. Professor Mishkin has recognized: "The functions of habeas corpus change significantly when the relevant constitutional requirements are not those seeking to assure the reliability of the conviction process, but rather those seeking to advance other objectives, such as respect for human dignity and integrity. It is not that constitutional guarantees of this latter kind are any less important; the contrary may well be true. Indeed, it is precisely the importance of these guarantees which justifies the granting of federal habeas corpus for their violation." Mr. Justice Frankfurter asserted that the fourth amendment has "a place second to none in the Bill of Rights," that it is not just "a kind of nuisance, a serious impediment in the war against crime." . . . Separating out violations which infringe upon the bounds of the fourth amendment for the purpose of denying collateral, though not direct, relief effectively relegates this guarantee to the ranks of a secondary privilege. Even more apparent is the obvious and somewhat self-impeaching contradiction contained within a system which expresses its repugnance at such a violation by foregoing convictions based upon unconstitutional evidence, but which condones such convictions if the error is not righted on direct appeal. The taint of a constitutional violation does not become *attenuated* by the exhaustion of direct remedies. The existence of habeas corpus belies this belief. And, if this is true as to one type of constitutional violation, it should be true as to all.

Lay, *Modern Administrative Proposals for Federal Habeas Corpus: The Rights of Prisoners Preserved*, 21 DePaul L.Rev. 701, 723–24 (1972) (footnotes omitted).