No. 80–1910. VASQUEZ *v*. UNITED STATES. C. A. 2d Cir. Certiorari denied. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Opinion of JUSTICE STEVENS respecting the denial of the petition for writ of certiorari.

Practical considerations preclude the Court from explaining its reasons for denying petitions for certiorari. See *Maryland* v. *Baltimore Radio Show, Inc.*, 338 U. S. 912 (opinion of Frankfurter, J., respecting the denial of the petition for writ of certiorari). Opinions dissenting from the denial of certiorari are answered so rarely that they may some-

times create an unwarranted impression that the Court is not administering its certiorari docket in a responsible way.[1] Because I was concerned that JUSTICE REHNQUIST's opinion in *Davis* v. *Jacobs, ante,* p. 915, might create such an impression, I thought it appropriate to write in response. A similar concern prompts me to write in this case.

JUSTICE BRENNAN's dissenting opinion correctly points out that there are substantial arguments favoring a grant of certiorari. There are, however, at least three countervailing considerations militating in favor of a denial of certiorari that do not clearly emerge from a reading of the dissenting opinion.

First, there is no allegation in the petition for certiorari that there is a conflict between the decision of the Court of Appeals in this case and any other Federal Court of Appeals decision. Often the law develops in a more satisfactory fashion if this Court withholds review of novel issues until differing views have been expressed by other federal courts.[2]

Second, it is not clear that petitioner has standing to object to the seizure of evidence in this case. At issue is the legal-

---

[1] "One characteristic of all opinions dissenting from the denial of certiorari is manifest. They are totally unnecessary. They are examples of the purest form of dicta, since they have even less legal significance than the orders of the entire Court which, as Mr. Justice Frankfurter reiterated again and again, have no precedential significance at all.

"Another attribute of these opinions is that they are potentially misleading. Since the Court provides no explanation of the reasons for denying certiorari, the dissenter's arguments in favor of a grant are not answered and therefore typically appear to be more persuasive than most other opinions. Moreover, since they often omit any reference to valid reasons for denying certiorari, they tend to imply that the Court has been unfaithful to its responsibilities or has implicitly reached a decision on the merits when, in fact, there is no basis for such an inference." *Singleton* v. *Commissioner,* 439 U. S. 940, 944–945 (opinion of STEVENS, J., respecting the denial of the petition for writ of certiorari).

[2] "Wise adjudication has its own time for ripening." *Maryland* v. *Baltimore Radio Show, Inc.,* 338 U. S. 912, 918.

ity of a warrantless search of the fourth floor apartment at 633 Grand Street in Brooklyn, N. Y. The landlord at 633 Grand testified both at the suppression hearing and at trial that a man named Jorge Osorio, and not petitioner, had rented and lived in the fourth-floor apartment. Petitioner himself introduced into evidence two utility bills addressed to Jorge Osorio at 633 Grand Street. Moreover, petitioner challenged on appeal the sufficiency of the evidence against him on the grounds that it had not been shown that he was the renter of the apartment, or that he was a knowing participant in a conspiracy.[3]

Third, Judge Kearse's thorough opinion for the Court of Appeals, which occupies 55 printed pages of the appendix to the certiorari petition, demonstrates that the decision of the court was based on the totality of the specific factual circumstances of this case.[4] It is often appropriate to decline to review a decision that turns on details of the evidence that are not likely to be duplicated in other cases. Unfortunately, to assess fairly the import of the decision of the Court of Appeals, one must review at some length the detailed facts underlying that decision.

---

[3] The Court of Appeals' opinion does refer to evidence suggesting that petitioner had rented the fourth-floor apartment, but does not expressly resolve the issue. It is sound practice, however, to deny a petition for certiorari when the facts do not firmly establish that the petitioner has standing to raise the question presented. Cf. *Mental Hygiene Dept. of Cal.* v. *Kirchner*, 380 U. S. 194, 200.

[4] JUSTICE BRENNAN suggests, in his dissenting opinion, that the Court of Appeals has enunciated a broad exception to the warrant requirement that "not only authorizes the police to enter a home without a warrant in circumstances far less compelling than we have recognized, but permits law officers, in determining the time and manner of executing an arrest, to contrive their own exigency and thereby avoid the necessity of procuring a warrant before entering the home." *Post*, at 983. In my judgment, this is not a fair characterization of the cautious and circumscribed opinion written by Judge Kearse.

The search at issue arose out of a police surveillance at 633 Grand Street on the evening of November 29, 1979. During the early hours of the evening, police officers arrested three sets of individuals as a result of that surveillance, each of which was in possession of a large quantity of cocaine. Amparo Medina left the building at 633 Grand carrying a large handbag, eluded the police, and returned home; police later arrested Medina and her husband Fernando after Fernando left the Medina home and officers found one pound of cocaine in his car. Clara and Hernando Mesa next exited 633 Grand; police arrested the Mesas after finding one-half pound of cocaine in their car. Within a short period of time, Carlos Sanchez left 633 Grand with a shopping bag; police arrested Sanchez after finding a pound of cocaine in the bag. The police made each of these arrests outside of the view of individuals remaining at 633 Grand.

After arresting Sanchez, the police observed three men, later identified as Jaramillo, Parra, and Uribe, leave 633 Grand. The officers stopped the three men, and led them around the corner and out of sight of anyone remaining inside. Although it was a cold night, Jaramillo had come outside wearing only a shirt, pants, and slippers with no socks; Jaramillo also did not carry any keys. The officers asked Jaramillo and Parra what apartment they had been in. The men replied that they had been visiting a woman in the second-floor apartment, and Jaramillo agreed to accompany the officers to that apartment. While Jaramillo and the officers were en route to the apartment, petitioner and Essau Correa exited 633 Grand and were detained by the police.

Jaramillo led the officers to the second-floor apartment, and Dora Wright, the landlord of the building, opened the door. Several officers, with guns drawn, immediately entered and fanned out through the apartment, checking each room for other persons. Jaramillo asked Wright in Spanish to tell the police that he had been with her earlier, but she

replied that this was not so. Instead, Wright stated that throughout the day Jaramillo and others had been in and out of the fourth-floor apartment. As the officers spread through the apartment to assure themselves that it was not the scene of the narcotics operation, Dora Wright, her mother, and her baby all began to scream. By all accounts, the scene was tumultuous, and the three were still screaming 10-15 minutes later.

At this point, the officers decided to enter the fourth-floor apartment. The officers testified that they feared that additional persons might be in the apartment who might be aware of the activities of the police and would destroy evidence. To avoid a planned forced entry, Wright gave the officers a key.

On entering each room of the fourth-floor apartment, the officers seized a series of items. From an open foyer closet, the officers seized white powdery substances wrapped in clear plastic bags, some of which were inside an open plastic garbage bag and others of which were in an open traveling bag. In the center bedroom they seized a number of documents from an open box. In the rear bedroom they found, exposed to open view, a pound of cocaine, a triple-beam scale, and a large piece of glass covered with cocaine residue. They also found, in an open box lying in a metal cabinet, 16 bottles of Mannitol, 2 strainers, assorted boxes of plastic bags, a set of weights, and a scale. An officer also seized a pistol that he found as he "absentmindedly reached between the mattress and the box spring" of a bed on which he was sitting.

The initial check of the apartment was completed in a few minutes. The officers remained, however, for an additional 16 hours.

In response to petitioner's motion to suppress evidence seized from the apartment, the District Court ruled that only those items observed in plain view during the initial cursory inspection of the apartment were admissible. The court sup-

pressed the items seized from the box inside the metal cabinet, the documents seized after the initial entry, and the gun found under the mattress. On appeal, the Court of Appeals upheld the admission into evidence of items seized during the initial cursory inspection of the premises.

In light of the suppression of certain evidence by the District Court, the only issue that is now presented is whether the police were entitled to enter the fourth-floor apartment without a warrant to make a cursory inspection of the premises. In considering the resolution of this issue by the Court of Appeals, it is illuminating to state in full the discussion and limited holding of the court:

> "The circumstances at 633 Grand Street present a very close question. Siegel testified that the agents were concerned that people remaining in the apartment might destroy evidence there, and there was some basis for this. Jaramillo and Parra had tried to divert the officers' attention from the fourth floor by telling them they had come from the second floor; and Wright revealed that Jaramillo's conversation with her in Spanish, when the agents went to her second-floor apartment, asked her to confirm this misdirection. Such attempts at diversion suggested that the fourth floor apartment contained evidence, or other persons, or both. It is true that one officer who placed his ear to the door of that apartment heard no sounds from inside, but there was another basis for believing that one or more persons remained in the apartment. It was a cold night, and Jaramillo had come outside wearing only a shirt, pants, and slippers with no socks. He had no key with him, and it could be inferred that there was someone in whatever apartment he had come from—the fourth floor apartment according to Wright—to let him back in. It was therefore reasonable to infer that evidence could well be destroyed if the persons remaining there were alerted to the agents' activities.

"By the time the agents determined that Jaramillo's designation of the second floor was a red herring, there was ample cause to believe that any remaining occupant of the fourth floor would have been alerted. For most of the evening the agents had managed to effect their arrests and investigatory stops out of the line of sight of the apartment. The last stops, however, had been made in front of the building. Then, when Jaramillo's claim that he had been on the second floor was being investigated, there was an extended commotion resulting from the involvement of the apparently unsuspecting Mrs. Wright and the entry of several agents into her apartment in the expectation, based on Jaramillo's statement, that they were at the scene of the cocaine operation.

"We do not accept [petitioner's] contention that a security check was improper because the duration of the commotion would have allowed the destruction of any evidence to be completed before the officers entered. We do not think the exigency abated because the second-floor tumult lasted 10-15 minutes. What is troublesome, however, is the fact that the agents went far beyond the bounds of the permissible security check. Although it took but a few minutes to determine that there were no other people in the apartment, *they remained there for sixteen hours.* They seized not only items that were in plain view, but also, obviously, items that were completely hidden from view. The district judge suppressed thirteen items that he determined were 'the products of a thorough search of the premises.' Had the district court inferred from these facts that the agents' intention in entering the apartment was not to conduct a security check, we would be hard-pressed to hold such a finding clearly erroneous.

"In fact, however, the district court implicitly found that the officers entered with the intention to make a se-

curity check, and explicitly found that there were reasonable bases for their belief that additional evidence was present in the apartment and that there might be someone there who could destroy it. Since these explicit findings, which are not clearly erroneous, justified a security search, the items in plain view during the course of that search were properly seized." 638 F. 2d 507, 531–532. (Emphasis in original.)

The Court of Appeals noted that a "very close question" was presented in this case. After carefully appraising the facts, the court concluded that the police were justified in executing a warrantless entry to make a cursory inspection of the premises to guarantee that evidence was not being destroyed.[5] In declining to grant certiorari to review that ap-

---

[5] Such a conclusion does not lack support in decisions of this Court. In *Schmerber* v. *California*, 384 U. S. 757, the Court held that the administration of a blood test to check for the presence of alcohol, without the authority of a search warrant, did not violate the Fourth Amendment. In his opinion for the Court, JUSTICE BRENNAN wrote:

"Although the facts which established probable cause to arrest in this case also suggested the required relevance and likely success of a test of petitioner's blood for alcohol, the question remains whether the arresting officer was permitted to draw these inferences himself, or was required instead to procure a warrant before proceeding with the test. Search warrants are ordinarily required for searches of dwellings, and, absent an emergency, no less could be required where intrusions into the human body are concerned. The requirement that a warrant be obtained is a requirement that the inferences to support the search 'be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.' *Johnson* v. *United States*, 333 U. S. 10, 13–14; see also *Aguilar* v. *Texas*, 378 U. S. 108, 110–111. The importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great.

"The officer in the present case, however, might reasonably have believed that he was confronted with an emergency, in which the delay neces-

praisal of the facts, this Court does not in any way suggest that an individual's home is not entitled to rigorous Fourth Amendment protection. Indeed, recent decisions of this Court, see, *e. g., Payton* v. *New York*, 445 U. S. 573; *Steagald* v. *United States*, 451 U. S. 204, as well as decisions of the Courts of Appeals, see, *e. g., United States* v. *Rosselli*, 506 F. 2d 627, 630 (CA7 1974); *United States* v. *Rubin*, 474 F. 2d 262, 268 (CA3 1973), prove just the opposite.

In my opinion, this Court has not abused its discretion in allowing the judgment of the Court of Appeals to stand.

JUSTICE BRENNAN, with whom JUSTICE WHITE and JUSTICE MARSHALL join, dissenting.

Unless supported by a warrant issued upon probable cause, entry into a home to conduct a search is *per se* unreasonable, "subject only to a few specifically established and well-delineated exceptions." *Katz* v. *United States*, 389 U. S. 347, 357 (1967). In this case the Court of Appeals purported to identify and apply a "security check" exception to the warrant requirement which, as I understand the opinion below, would allow warrantless entry into a home following an arrest outside, if the arresting officers possess a reasonable belief that third persons are inside and aware of the arrest, "so that they might destroy evidence." 638 F. 2d 507, 531. The exception thus stated not only authorizes the police to enter a home without a warrant in circumstances far less compelling than we have recognized, but permits law officers, in determining the time and manner of executing an arrest, to contrive their own exigency and thereby avoid the necessity of procuring a warrant before entering the home. This case illustrates the potential danger of this exception to

sary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence,' *Preston* v. *United States*, 376 U. S. 364, 367." *Id.*, at 770.

Fourth Amendment protection, and surely the Court ought not let the decision stand without plenary review.[1]

## I

The search at issue arose out of the investigation of a cocaine distribution ring by the New York Drug Enforcement Task Force. Officers of the Task Force followed a suspected member of the ring to a building in Brooklyn; a store occupied the first floor of the building, while the three floors above each contained one apartment. The officers took up surveillance outside the building. Lights were visible only on the fourth floor. In the course of the evening, the officers twice stopped persons leaving the building, discovered cocaine in their possession, and made arrests. Some time later they

---

[1] As JUSTICE STEVENS notes, *ante*, at 977, Judge Kearse's opinion for the Court of Appeals describes in considerable detail the factual background pertinent to petitioner's claim here. In addition, the opinion clearly states the legal standard believed applicable, and applies that standard in appraising the police conduct in question and the ruling of the District Court. But this in my view makes this case a particularly good vehicle for the exercise of our certiorari jurisdiction: the facts developed by the Court of Appeals suggest that a more restrictive standard respecting the circumstances under which warrantless entry of a home is constitutionally permitted would have produced a contrary ruling on petitioner's motion to suppress; and the factual analysis of the Court of Appeals would be most helpful to this Court in defining a standard meaningful to police officers in the execution of their responsibilities, and capable of consistent application in the courts.

While there is some evidence suggesting that petitioner had no protectible interest in the fourth-floor apartment, I do not share JUSTICE STEVENS' concern whether petitioner had standing to contest this search. It is apparent to me that any possible question which was or could have been raised in that regard was resolved by the Court of Appeals in favor of petitioner. But whether that question, or other considerations identified by JUSTICE STEVENS, or any number of other factors not suggested by him, persuaded my colleagues against the exercise of our certiorari jurisdiction here, quite obviously my own view is that this is a very appropriate case for plenary review.

observed three men leaving the building, stopped them, brought them around the corner, and held them in custody. The officers asked what apartment they had been in. One of the detainees replied that they had been visiting a woman in the second-floor apartment, but would not give her name. Upon request, however, he agreed to accompany the officers to that apartment. As they approached the entrance, the officers saw petitioner exiting the building, recognized him as a known cocaine dealer, and placed him in custody with the others.

With the assistance of their detainee, the police persuaded the occupants of the second-floor apartment to open the door. The court below described the ensuing scene as "tumultuous," as the officers, guns drawn, immediately entered and fanned out to search the apartment for cocaine amidst the screams of the landlady, her mother, and her baby. Ultimately recognizing that they had entered and searched the wrong apartment, the officers announced their intention to climb to the fourth-floor apartment and enter through the window from the fire escape, prompting the landlady to produce a key.

The officers found no one in the fourth-floor apartment, but they did discover several items of drug paraphernalia, as well as one pound of cocaine said to be in plain view in an open foyer closet. These items were admitted into evidence in the course of petitioner's trial for conspiracy to distribute cocaine and possession of cocaine with intent to distribute. The District Court did suppress, however, a number of additional items discovered by the officers in the course of their 16-hour warrantless habitation of the premises, concluding that these items had been discovered in the course of a search which exceeded the permissible bounds of a security check.

The Court of Appeals affirmed, holding that the officers' entry and cursory search of the apartment fulfilled the requirements of the security check exception as applied in that

Circuit. The court found support for the officers' belief that the fourth-floor apartment contained suspects and evidence in the fact that the police had initially been diverted away from that apartment by their detainees. Additional support for the presence of persons in the apartment was found in the fact that one of the detainees had come to the street, despite the coolness of the evening, wearing only a shirt, pants, and slippers, and without a key in his possession. The reasonable belief that if other persons were in the apartment, they knew of the arrest, rested on the location of the arrest and the commotion which resulted from the search of the second-floor apartment.

## II

The Court of Appeals sought support for its recognition of an exception to the warrant requirement for a "'security check' or 'protective sweep' incident to a lawful arrest" in *Chimel* v. *California*, 395 U. S. 752 (1969). 638 F. 2d, at 530. In *Chimel* we held that police may not routinely search a residence as an incident to a lawful arrest on the premises. In order to ensure the safety of the arresting officer and to prevent the destruction of evidence, however, we recognized that police may, as an incident to the arrest, lawfully search the area within an arrestee's immediate control. Building on this rationale, several courts have allowed officers engaged in an arrest in a dwelling, to conduct a "quick sweep" for other persons on the premises who might pose a danger to the police.[2] But as the Court of Appeals itself recognized in this

---

[2] See *United States* v. *Gardner*, 627 F. 2d 906 (CA9 1980); *United States* v. *Spanier*, 597 F. 2d 139 (CA9 1977); *United States* v. *Cravero*, 545 F. 2d 406 (CA5 1976), cert. denied *sub nom. Miller* v. *United States*, 429 U. S. 1100 (1977); *United States* v. *Cepulonis*, 530 F. 2d 238 (CA1), cert. denied, 426 U. S. 908 (1976); *United States* v. *Rich*, 518 F. 2d 980 (CA8 1975), cert. denied, 427 U. S. 907 (1976); *United States* v. *Looney*, 481 F. 2d 31 (CA5), cert. denied, 414 U. S. 1070 (1973); *United States* v. *Cristophe*, 470 F. 2d 865 (CA2 1972), cert. denied *sub nom. Panica* v. *United States*, 411 U. S. 964 (1973). See also *Chimel* v. *California*, 395 U. S., at 775 (WHITE, J.,

case, whatever the merit of such a sweep where the police are otherwise lawfully on the premises, "[d]ifferent considerations come into play . . . when a defendant is arrested outside his residence and the government seeks to justify an entry into the home for a security check." 638 F. 2d, at 531. Nevertheless, noting that other courts have permitted a sweep into the home in search of persons following an arrest outside,[3] the Court of Appeals sustained the validity of the warrantless entry and initial search here based on nothing more than the officers' "reasonable belief" that there were additional persons in the apartment who were aware of petitioner's arrest.

Despite the currency of the doctrine in the lower courts, no decision of this Court supports the existence of a general "security check" exception to the warrant requirement. Quite to the contrary, even before *Chimel* we held that "a search 'can be incident to an arrest only if it is substantially contemporaneous with the arrest and is confined to the *immediate* vicinity of the arrest.'" *Shipley* v. *California*, 395 U. S. ·818, 819 (1969) *(per curiam)*, quoting *Stoner* v. *California*, 376 U. S. 483, 486 (1964). As we noted in *Shipley*, "the Constitution has never been construed by this Court to allow the police, in the absence of an emergency, to arrest a person

---

dissenting) (possible removal of evidence should justify search following arrest in residence). But see *United States* v. *Gamble*, 473 F. 2d 1274 (CA7 1973).

[3] Several of the cases have allowed a security search where police possessed a reasonable apprehension of violence from within the house as they executed an arrest outside. See *United States* v. *Baker*, 577 F. 2d 1147 (CA4), cert. denied *sub nom. Weinstein* v. *United States*, 439 U. S. 850 (1978); *United States* v. *Bowdach*, 561 F. 2d 1160 (CA5 1977); *Hopkins* v. *Alabama*, 524 F. 2d 473 (CA5 1975). At least two federal cases other than this one have ratified warrantless security searches premised solely on an asserted desire to preserve evidence. See *United States* v. *Fulton*, 549 F. 2d 1325 (CA9 1977); *United States* v. *McLaughlin*, 525 F. 2d 517 (CA9 1975), cert. denied, 427 U. S. 904 (1976). See also *Thomas* v. *Parett*, 524 F. 2d 779 (CA8 1975); *United States* v. *Rubin*, 474 F. 2d 262 (CA3), cert. denied *sub nom. Agran* v. *United States*, 414 U. S. 833 (1973).

*outside* his home and then take him inside for the purpose of conducting a warrantless search." 395 U. S., at 820. Indeed, our precedents can more reasonably be read as interpreting the Fourth Amendment to bar the warrantless entry of a residence predicated solely on the belief that persons on the premises, knowing of the arrest, might destroy evidence. See *Vale* v. *Louisiana,* 399 U. S. 30 (1970).

We have, of course, recognized that a warrantless entry is permissible in an exigent circumstance. See *Mincey* v. *Arizona,* 437 U. S. 385, 393 (1978). But even assuming that the need to preserve evidence could provide a basis for a finding of exigent circumstances sufficient to allow the police to enter a home without a warrant, cf. *Schmerber* v. *California,* 384 U. S. 757, 770 (1966), the Constitution surely requires a far more substantial showing of exigency than was made here: Not only must there have been probable cause to search, but there must also have been a "reasonable belief," based on articulable facts, that the destruction of evidence was imminent; and further, there must be the assurance that the emergency giving rise to the warrantless entry could not responsibly have been avoided. See *United States* v. *Rosselli,* 506 F. 2d 627 (CA7 1974). Because from all appearances the warrantless entry in this case can be justified neither as a search incident to an arrest nor as compelled by exigent circumstances, and because the court below enunciated a broad exception to the warrant requirement not recognized by any decision of this Court, and which can all too easily become "enthroned into the rule," *United States* v. *Rabinowitz,* 339 U. S. 56, 80 (1950) (Frankfurter, J. dissenting), I would grant certiorari and set this case for argument.