Rape; twenty years imprisonment.
In June, 1978, the prosecutrix lived alone at 1042 48th Place, North in an apartment complex in the community of Kingston in Birmingham, Jefferson County, Alabama. About 3:00 A.M. on June 15, 1978, the prosecutrix was awakened by a naked black man sitting on her chest and holding his hands over her mouth and her throat. The prosecutrix was told that if she did not make any noise she would not be hurt. According to the prosecutrix, they began to scuffle on the bed, and her attacker hit her on the head and in the eye. The prosecutrix recalled that, when she asked the appellant why he was doing this to her, he replied that, "He didn't have anyone else, and you know, I was as good as any."
As the struggle continued, the attacker attempted to force the prosecutrix to have oral sex with him, but she was successful in avoiding him. At that point, her assailant again hit her with his fist. Subsequently, he forced the prosecutrix to have intercourse with him. After the intercourse, the assailant grabbed the prosecutrix's hair and forced her to walk with him into the living room, then into the kitchen. The assailant retrieved his clothes from a chair and dressed. Subsequently, the prosecutrix asked to go to the bathroom, and, after she entered it, she locked the door. Shortly afterwards, she heard the backdoor slam, and, after waiting "a little while," she left the bathroom. The prosecutrix, dressed in a robe, then went to the apartment of neighbors, Sheila and Dwane Morris. She told them what had occurred, and the Birmingham Police were subsequently called.
According to the prosecutrix, her bedroom was located in the rear of the apartment near an alley lighted by mercury vapor lights. She testified that her bedroom was illuminated by light originating from the streetlight. She recalled that the bedroom window had a shade which was pulled down to within six or eight inches of the window sill. She stated that she had no problem seeing in the bedroom under such conditions and could find anything she wanted without turning on any lights. Further, she testified that her backdoor faced the alley and that, while she and her assailant were in the kitchen, the backdoor was open.
The prosecutrix recalled that, during the struggle, the assailant had picked up a statue in her bedroom, apparently with the intention of hitting her. Also, she stated that they were in the bedroom for approximately thirty-five to forty-five minutes and were in the kitchen between ten to fifteen minutes.
When the police arrived, she described to officers, Gerald R. Attaway and Ward Haralson, her assailant as a black male, approximately twenty-four years old, five feet and eleven inches in height, 170 pounds, with large lips, round eyes, a narrow nose bridge, plaited hair with colored rubber bands on the ends, and a beard.
One week later, at 1:30 A.M., on June 22, 1978, while visiting the Morrises, the prosecutrix noticed a man moving through the cars parked in the apartment complex. She said that the man made his way to two dumpsters located across the street from the Morrises' apartment and that he appeared to be "snooping." The police were called and, when they arrived, Officer Attaway had a conversation with the prosecutrix. The man near the dumpsters was apprehended and taken to the police car. The prosecutrix recognized the man as her assailant. When the second patrol car drove up, its headlights were shining on the appellant and at that time she identified him as her assailant.
The following day, on June 23, 1978, she went to family court, observed a lineup, and again identified the appellant as her assailant. During the trial, she made a positive in-court identification of the appellant as the man who had raped her on June 15, 1978.
During cross-examination, the prosecutrix explained that she had her bedroom shade pulled up about eight inches from the window sill and the window open in order to allow air to flow into her unairconditioned *Page 395 
apartment. Also, she stated that the appellant did not enter through the bedroom window. She testified that the windows of her apartment opened outward and the screens were located on the inside of the windows. According to the prosecutrix, the appellant must have entered her apartment through the living room window. She explained that the screen to that window was found in the yard outside the apartment, but she could not recall if the living room window had been locked.
The prosecutrix identified, for the police evidence technician, different items which the appellant had touched while he was in the apartment.
Asked to restate the description of her assailant which she had previously given, she said, "He had on dark pants, dark print shirt."
During further cross-examination, she repeated her testimony concerning the events on June 22, 1978, and stated that Beverly Jackson, a friend, was also present at the Morrises' apartment. According to the prosecutrix, at the time she identified the appellant as her assailant, he did not have colored rubber bands in his hair. Further, she said that, on June 15, 1978, the appellant was wearing a dark, floral print shirt, but she was never asked in two previous trials whether it was short or long sleeved.
In an attempt to impeach the prosecutrix's description of the appellant, the appellant's counsel pointed out that she had not mentioned the narrow nose bridge. During redirect examination the prosecutrix explained that, whenever she had said "narrow nose" she had demonstrated on the bridge portion of her own nose that portion of appellant's nose to which she was referring. Also, she explained that, on June 15, 1978, the appellant's face was approximately three to four inches from her face.
Officer Attaway, after receiving a radio dispatch on June 15, 1978, at approximately 3:50 A.M., arrived at the prosecutrix's residence to investigate the complaint. The prosecutrix's condition at that time was "highly emotional." She had "bruises on her face and was extremely disoriented." The description of the assailant given to Attaway at the time by the prosecutrix was virtually the same as that given by her during the trial.
Attaway recalled that, on June 22, 1978, around 1:00 A.M., he responded to a dispatch and again went to the prosecutrix's residence. Upon his arrival, he conversed with the prosecutrix, then he and his partner went to an area where a dumpster was located. At that time, they apprehended the appellant, then returned to their patrol car. Attaway had a second conversation with the prosecutrix prior to a second patrol car arriving. After this conversation, Attaway placed the appellant under arrest and transported him to the city jail where photographs, which were later admitted into evidence, were made.
During cross-examination, Attaway stated that his partner on June 15, 1978, was Officer M.D. Crawford, and on June 22, 1978, was Officer Ward Haralson. Attaway said the appellant told him that he lived in the neighborhood and was going to see a girlfriend. According to Attaway, the appellant was searched, handcuffed and led to the police car.
On June 15, 1978, Birmingham Police Officer L.E. Stricklin, an evidence technician, went to the prosecutrix's residence. After being shown the items which the appellant touched, he lifted four latent fingerprints. Also, he made additional photographs at the request of the district attorney.
Fingerprint Technician Donna Vogel, of the Birmingham Police Department, made a comparison between the latent fingerprints and found that only one latent fingerprint contained sufficient detail to make an identification. However, that fingerprint was not identified as the appellant's.
At the end of Vogel's testimony the State rested its case. The appellant did not move to exclude and called Frank Buckley, probation officer with the Jefferson County Juvenile Court.
On the morning of June 22, 1978, a lineup was arranged in the chapel of juvenile detention hall in family court. Members of *Page 396 
the lineup, chosen from volunteers in the detention hall, closely resembled the appellant. Five black males, each wearing blue-jeans and "tee shirts," made up the lineup viewed by the prosecutrix. According to Buckley, only the appellant had a beard, and one other member of the lineup had "plaited hair." Buckley stated that the appellant was five feet and seven inches tall and weighed two hundred pounds.
During cross-examination, Buckley stated that he was with the prosecutrix as she viewed the lineup and that, within five to ten seconds, she had identified the appellant.
Eloise Green, the appellant's mother, testified that in June, 1978, the appellant was seventeen years of age and worked at "Help Unlimited." According to Mrs. Green, she was working in the Ketona Nursing Home as a nursing assistant at the time, and her "off days" that month were June 7th, 8th, 15th, 16th, 23rd, and 24th. She recalled that, on June 14, 1978, she left work around 11:00 P.M. and drove to her mother's home before driving to her home. When she arrived home at approximately 12:00 P.M., the appellant was not there. Later between 12:30 and 1:00 A.M., on June 15, 1978, she saw him in the hallway walking toward the bathroom. After leaving the bathroom, he went to the kitchen and "ate something, then went to bed." According to Mrs. Green, the bedrooms were across the hall from each other, and the doors remained open. Further, she said that, during the early hours of June 15, 1978, she was studying for her State nurses' examination and she did not go to bed until approximately 5:00 A.M. According to the witness, the appellant did not leave his room during that time. She testified that the appellant had "plaits" in his hair and was wearing a light blue shirt and short pants. Also, she said the appellant never wore rubber bands in his hair, that he did not own a flowered shirt, and that he had a full beard on the date of the rape.
During cross-examination, Mrs. Green stated that the prosecutrix's apartment complex was located approximately three or four blocks from her home.
Charlie Frank McMorris took the stand in his own behalf and testified that he did not own a "flowered" shirt in June, 1978. He stated that his girlfriend, Alice Stewart, "plaited" his hair, but she did not put rubber bands on the ends of the plaits. According to the appellant, between 6:00 and 7:00 P.M., on June 14, 1978, he had arrived at his girlfriend's residence and had left approximately at 12:00 P.M. Afterwards, he walked twelve to thirteen blocks from her house to his home in approximately forty-five minutes. After arriving at his home between 12:30 and 1:00 A.M., he saw his mother and his sister. He recalled that, prior to going to bed where he had remained until the next morning when he got up for work, he had gone to the bathroom, then to the kitchen.
The appellant testified that, on that occasion, he was wearing short pants, a cut-off shirt, tennis shoes and a cap. Also, he stated that his hair was in "plaits."
According to the appellant, he had visited his girlfriend on June 22, 1978, and was on the way home when he stopped to buy a soda at a convenience store located near the prosecutrix's apartment complex. After leaving the store, he walked through the complex, stopped at a dumpster to throw the empty can away, and noticed some magazines. He denied stooping between and looking over and around the cars parked in the complex. The appellant testified that he looked at the magazines, and, when he threw them back into the dumpster, he saw a police car entering the complex and heading toward him. He stated that he stood by the dumpster, and, when the police arrived, he told them that he had been to see his girlfriend.
According to the appellant, he was taken to the patrol car, searched and handcuffed. Afterwards, while he was in the backseat of the patrol car, a second patrol car arrived. Subsequently, he was transferred to the city jail where he was photographed. He was later taken to the juvenile detention hall. The appellant stated that, at the time he participated in the lineup, he wore blue-jeans *Page 397 
and a "blue-like tee shirt." The appellant concluded his testimony by denying he had gone to the prosecutrix's apartment and raped her.
During cross-examination, the appellant testified that he had visited his girlfriend about five times a week and had followed a different route home on June 22, 1978, than he did on June 14, 1978. He recalled that on June 14, 1978, he was within one block of the apartment complex where the prosecutrix lived. Also, he testified that on June 14, 1978, his hair was "plaited" and he had a beard. According to the appellant, on June 22, 1978, there were two dumpsters at the apartment complex, and he had been there for only a "couple of minutes" before the police arrived. He testified that he was wearing a long sleeved-shirt and long pants.
The appellant concluded his case after calling two court reporters. The State ended its case after calling, in rebuttal, Mrs. Green and the prosecutrix.
 I
The appellant contends that records transferring jurisdiction in his case from the juvenile court to the circuit court were not in the clerk's file. He maintains that the circuit court did not have jurisdiction and did not give notice of this transfer.
This precise issue was raised on a motion for a new trial, and, during the hearing on that motion, the State offered into evidence the juvenile court file which apparently had been sent to the circuit court clerk. The file indicated the following: (1) a motion for a transfer had been filed by the district attorney's office; (2) a hearing had been held in juvenile court with the appellant and his trial attorney present; (3) written findings were made by the juvenile court judge pursuant to § 12-15-34 (f); (4) the order of transferral was issued by the juvenile court judge. Also, the appellant admitted that the transfer order was a part of the circuit court clerk's file.
It is clear that the appellant and his trial counsel had knowledge that the appellant's case had been transferred. Additionally, the transfer ordered by the juvenile court was a part of the circuit court clerk's file, and the appellant had notice of that fact. Therefore, the circuit court had jurisdiction over the appellant and the subject matter of his case. See Carpenter v. State, Ala., 378 So.2d 730; Winstead v.State, Ala., 371 So.2d 418; Allums v. State, Ala.Cr.App.,368 So.2d 313; Smith v. State, Ala.Cr.App., 368 So.2d 298.
 II
The appellant asserts that the trial court erroneously quashed a prior jury which was struck, but unsworn. He argues that the court improperly granted the State a continuance after the jury had been selected because of the "alleged non-availability of some police personnel witnesses."
On May 1, 1979, appellant's case was called for trial and a jury was chosen, but not sworn, and the trial was recessed until May 2, 1979. On May 2, 1979, the State requested a continuance, due to the unavailability of police witnesses who were on strike at the time. The appellant objected, assigning as grounds that the jury had been selected and much time had been spent upon preparation of the case. Further, he stated that the appellant was present, along with his witnesses, and was, consequently, prepared for trial.
Though the trial court did not specifically rule on the State's motion, the court quashed the jury venire and gave the following explanation:
 "THE COURT: Due to the police strike, Mr. Colee can't get his witnesses that he needs and is essential for the case. And since you all haven't been sworn, the court is going to do what they call quash the venire. It didn't declare a mistrial, because you haven't been sworn. So, apparently no jeopardy will occur."
The case was re-scheduled, and, on July 31, 1979, prior to appellant's second trial on August 7, 1979, the appellant filed a motion to quash the indictment on the grounds that the trial court had abused its discretion by quashing the jury venire, thus denying him a fair trial. A stipulation, read into the *Page 398 
record by the appellant, indicated that, on May 2, 1979, the State had made no request for the trial court to issue writs of attachment for the witnesses and, except for the explanations that the court had given, no factual basis was given for the quashing of the jury venire. The appellant also filed a plea of double jeopardy based on the same facts. Both motions were overruled, and the trial was begun. It resulted in a mistrial because certain jurors had viewed the scene of the crime.
On September 2, 1979, a third trial was begun, and the appellant renewed his motions which he had filed on July 31, 1979. These motions, again, were overruled, and the appellant was convicted. Appellant moved for a new trial, wherein he contended that, because the May 1, 1979, jury panel was composed of both blacks and whites and the jury which convicted him was an all white jury, he, a black man, was deprived of due process of the law. In his brief, appellant argues that the trial court's ruling also denied him a fair and speedy trial. At the hearing on the motion for a new trial, testimony revealed that Officer Edward Alley was the liaison officer for the Birmingham Police Department and the Jefferson County Court system. He testified that there was an "on call" procedure whereby an officer could continue his daily activities until the time when his testimony was needed at trial. Alley stated that the policemen's strike began at 11:00 P.M. on May 1, 1979, and ended at 7:00 A.M. on May 4, 1979. During that period, the police officers could not come to court and testify. In the case at bar, Alley attempted to contact the officers involved, but was unsuccessful. Alley testified that he reported this fact to the prosecuting attorney. During cross-examination, Alley stated that he attempted to contact the officers at home, but did not send a patrol car to their homes, nor did he leave a message. However, he did ask Sgt. Gaut to try and locate the officers on the picket line.
Alley testified that he had called Officer Attaway several times but to no avail. Further, he stated that he was sure that, had the officers been contacted, they would have appeared.
On re-direct examination, Alley said that none of the officers listed as witnesses in the instant case reported for duty during the strike. They could not be located through the police department, nor at their homes.
Betty Davis, an employee in the criminal division of the Jefferson County Circuit Court clerk's office, testified that, between April 30, 1979, and May 9, 1979, only two police witnesses claimed their attendance fees. She stated that they were Officer D. Hodges and Mrs. Donna Vogel.
Deputy District Attorney, Don Colee, testified that he participated in the May 1, 1979, jury selection. Further, he said that, on May 2, 1979, he talked with Sgt. Gaut concerning the whereabouts of the police witnesses and stated that he attempted to reach them at their respective homes, but was unsuccessful. The instant case had been originally assigned to John Black, another deputy district attorney, who, at the time, was engaged in another case. Colee recalled that Black did not indicate that the police officers were available as witnesses, or that the officers knew that the case was going to be tried that week.
Colee stated that, although he could have tried the case solely on the testimony of the prosecutrix, the prospect of winning the case without the officers' testimony was slight.
During cross-examination, Colee stated that he knew the officers had testified in a prior trial of the appellant. Colee considered them to be material witnesses.
A review of the foregoing facts indicates that the appellant has shown no prejudice to his substantial rights due to the trial court's actions. Generally, a ruling of the trial court is presumed to be correct and will not be overturned in the absence of a showing of abuse; therefore, the burden of demonstrating error in the court's ruling rests with the appellant. Pace v. State, 284 Ala. 585, 226 So.2d 645; Snipesv. State, Ala.Cr.App., 364 So.2d 424. *Page 399 
The record revealed the trial court was aware that the Birmingham Police Department was participating in the city employees' strike. It was also apparent that the court knew the officers were unavailable and their testimony was important. Also, the evidence adduced at the appellant's motion for a new trial illustrates the State's efforts in attempting to procure the witnesses.
Under the facts and circumstances in the instant case, we find that the trial court's ruling was correct and was a proper exercise of the court's discretion. Therefore, the appellant's motion for a new trial was properly overruled.
Under Boswell v. State, 290 Ala. 349, 276 So.2d 592, andSimpson v. State, Ala.Cr.App., 354 So.2d 317; we find no basis in the record for a claim of double jeopardy. The appellant admits that the jury chosen on May 1, 1979, was never sworn.
Furthermore, the record reflects no basis for a claim of denial of a speedy trial. This allegation appeared for the first time in appellant's brief. Consequently, there is nothing for this court to review. Gould v. City of Birmingham, Ala.Cr.App., 375 So.2d 1296; Slinker v. State, Ala.Cr.App.,344 So.2d 1264; Robinson v. State, Ala.Cr.App., 342 So.2d 1331.
 III
The appellant complains that the trial court erred in overruling his oral motions to quash the indictment and for a new trial on the ground that the State had systematically and discriminatorily excluded blacks throughout the course of the proceedings against him. This exclusion, he explains, was accomplished by the State's use of its peremptory strikes to keep blacks from serving on the juries. Accordingly, his rights to due process and equal protection of the law were contravened. He alleges that the State, through its prosecuting attorney, had systematically excluded blacks from all juries wherein the defendant was black, the victim white, and the crime was violent.
In the present case, the record indicates that two assistant district attorneys struck the jurors in the appellant's case, one making three strikes and the other making one strike.
No evidence in support of the appellant's motion to quash the indictment was presented. However, during the hearing on the motion for a new trial, he did present testimony.
Prior to the reception of evidence, the appellant argued that, in the three juries which had been struck in his case, the prosecuting attorney had utilized his peremptory strikes to remove blacks from the jury panel. This, he says, indicates a systematic and discriminatory exclusion of blacks.
According to Mr. Arthur Parker, the appellant's trial counsel, four different juries had been struck in connection with the appellant's case. He stated that, on March 22, 1979, a mistrial was declared in appellant's first trial; on May 2, 1979, a second jury was struck, but was discharged due to the unavailability of certain State witnesses; on August 3, 1979, a second mistrial was declared; and on September 27, 1979, the case was tried before a fourth jury which convicted the appellant. Mr. Parker explained that, during the selection of the juries at each of the trials involving the appellant, the State had exercised its peremptory strikes to remove blacks from the jury. Mr. Parker testified that he had practiced law for twenty-nine years and, during that time had handled over one hundred cases wherein the defendant was black and the victim was white. His testimony was that, over the past fifteen years, in approximately fifty of those cases, the State had invariably struck blacks from the jury panel with the intent of obtaining an all white jury.
During cross-examination, Mr. Parker admitted that, in four instances involving the appellant, he had utilized his peremptory strikes exclusively against whites. Further, four veniremen, two blacks and two whites, had been challenged for cause by the State and the appellant, respectively, for being over sixty-five years of age. *Page 400 
Also, Mr. Parker testified that, in a case such as the appellant's, the jury would tend to judge credibility and truthfulness along racial lines. He explained that the race of each jury panel member played a part in his decision whether to strike a particular juror.
Mr. Parker stated that he knew the court coordinator's office kept statistics on the composition of the various venires. The court offered to provide the appellant with those statistics, however, the appellant declined the offer.
Mr. Mike McCormick and Mr. William Dawson, both practicing attorneys in Jefferson County for a number of years, testified that, in cases involving black defendants and white victims, the State used its peremptory strikes exclusively to remove blacks from the jury panel. Mr. Dawson admitted during cross-examination that in two rape cases he had struck only whites from the jury panel. However, he also stated that, in recent years, the State had been more receptive to leaving blacks on juries for cases in which racial issues were not as prominent as they were in cases such as murder and rape.
In Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824,13 L.Ed.2d 759, the Supreme Court stated:
 "[W]e cannot hold that the striking of Negroes in a particular case is a denial of equal protection of the laws."
The court, in Swain, enunciated the burden necessary to establish a prima facie case of violation of the equal protection clause through purposeful and systematic exclusion of blacks from jury panels. The court said:
 "[W]hen the prosecutor in a county, in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries, the Fourteenth Amendment claim takes an added significance."
Once the systematic striking of Negroes in the selection of petit juries presents a prima facie case, the burden shifts to the State to prove, by clear and convincing evidence, that the selection process utilized was not racially motivated. Swain v.Alabama, supra; Beecher v. State, 294 Ala. 674, 320 So.2d 727.
In the instant case, the appellant showed that the prosecuting attorneys in his case had struck only blacks in selecting the juries which were to try his case. Also, the appellant offered testimony from experienced attorneys in Jefferson County, which showed that, where the defendant was black and the victim white, the State had used its peremptory strikes to remove only blacks.
Appellant's evidence also indicated, however, that such practice was not an exclusive one. No official records or official statistics were offered to substantiate the appellant's contention and the testimony of his witnesses.
It is apparent that the evidence in the present case was not sufficient to demonstrate invidious discrimination through the peremptory system which would establish a violation of the equal protection clause. Consequently, the trial court's rulings on the motion to quash the indictment and for a new trial were without error.
 IV
The appellant maintains that the trial court erred in denying his motion to suppress the prosecutrix's in-court identification of the appellant. He asserts that the June 22, 1978, and June 23, 1978, identifications were impermissibly suggestive.
The testimony presented at appellant's motion to suppress was the same as that presented during the trial. That evidence appears in the foregoing portions of this opinion, and we have found nothing in our examination of evidence relating to the June 22, 1979 identification which was impermissibly suggestive. Donahoo v. State, Ala.Cr.App., 371 So.2d 68; Carterv. State, *Page 401 
Ala.Cr.App., 340 So.2d 94, and cases cited therein.
Also, we have examined the evidence involving the June 23, 1978, lineup, and have found nothing impermissibly suggestive which would taint the in-court identification. Joshua v. State, Ala.Cr.App., 372 So.2d 885; Speigner v. State, Ala.Cr.App.,369 So.2d 39, and cases cited therein. See McLoyd v. State, Ala.Cr.App., 373 So.2d 1175.
 V
Appellant claims that the trial court erred in allowing Officer Attaway to testify to the prosecutrix's physical and mental condition and he also insists that the description of the rapist given on June 15th was improper.
The testimony involving the prosecutrix's physical and mental condition is found in the following testimony by Officer Attaway:
 "Q. Would you describe [prosecutrix's] condition when you saw her?
 "MR. PARKER: I object to that it calls for some mental operation and conclusion, undisclosed mental condition.
"THE COURT: Overruled. Proceed.
"MR. PARKER: We except.
 "A. The best of my recollection, I would say that she was in a highly emotional state. She was upset. She had bruises on her face, and she was extremely disoriented."
In Garraway v. State, Ala.Cr.App., 337 So.2d 1349, the court stated; "Witnesses may always be allowed to testify as to the appearance of other persons." Also, in Hamilton v. State,281 Ala. 448, 203 So.2d 684, we find the following:
 "Witnesses may always be allowed to testify as to the appearance and emotions of other persons."
Based on the foregoing authorities, it is our judgment that no error was shown in the admission of the testimony cited above.
Regarding appellant's assertion that Officer Attaway should not have been allowed to read from the June 15th investigative report, which was the description given by the prosecutrix of her intruder, we find the following:
 "Q. I see. And on that occasion there was a written report taken by your partner?
"A. Yes, sir there was.
 "Q. And that report was concerning her complaint that she made?
"A. Yes, sir.
 "Q. On that occasion did [the prosecutrix] give you a description?
"A. Yes she did.
"Q. What was that description?
 "MR. PARKER: We object, if your Honor please. That is hearsay. It's self-serving. It's an attempt to bolster the evidence.
"THE COURT: Overruled. Give it.
 "A. It was a black male, approximately 24 years of age, dark complexion, height 5' 11", weight 170, black hair, brown eyes, dark pants, flowered shirt with long sleeves. He had a beard. His hair was in corn rolls."
The testimony by the prosecutrix on cross-examination was substantially the same as the testimony given by Officer Attaway. The Alabama Supreme Court in Cox v. State, 280 Ala. 318, 193 So.2d 759, observed that there are two instances where the details of a prosecutrix's complaint may be proved. Those two instances are:
 "(1) They may be elicited, on cross-examination, by the defendant; and where this is done only in part, the State on rebutting examination, may then proceed to prove the whole complaint; (2) Where testimony of prosecutrix is sought to be impeached, by attempting to discredit her story, it is permissible, by way of corroboration for the State to prove such details."
The court did not err by overruling the appellant's objection. The appellant's attorney, on cross-examination, brought out details of the prosecutrix's description of her assailant; therefore, the State was entitled to show, by way of corroboration, the *Page 402 
description which the prosecutrix had given to the investigating officers.
 VI
The appellant insists that the following comments made by the prosecuting attorney during the State's closing argument were prejudicial and were erroneously permitted.
From the record:
 "MR. BLACK: Somebody tell me this: Where is Angela (Alice) Stewart?
 "MR. PARKER: Judge, I object to that and ask the Judge to charge the jury not to consider that. It's improper argument.
"MR. BLACK: Reply in kind, Your Honor.
"THE COURT: Overruled.
. . . . .
"MR. BLACK: Is she unavailable? No, not to him.
 "MR. PARKER: Judge, I object to that whole line of argument, and assign as grounds that she is equally available to him as she is to me.
 "THE COURT: Well, the Court is of a contrary opinion, so I'll overrule you."
The availability of a witness to one or the other of the parties is determined initially by the party's superior knowledge of the existence and identity of the witness. Henryv. State, Ala.Cr.App., 355 So.2d 411. Additionally, the relationship between the witness and the party that would reasonably be expected to affect the witness' personal interest in the outcome of the case is another factor to consider in determining to whom a witness is available. Brown v. State,50 Ala. App. 471, 280 So.2d 177.
Whether a witness is available or accessible within the meaning of the rule prohibiting comment upon the failure of a party to call or examine a witness does not mean availability or accessibility for subpoena purposes, but rather a particular party's superior knowledge of the existence, identity, and expected testimony of the witness. Henry, supra; Rueffert. v.State, 46 Ala. App. 36, 237 So.2d 520.
In the case at bar, the appellant was the party who interjected the witness' name into the trial by testifying that he had been at the witness' home on June 14, 1978, and June 22, 1978. Also, he stated that he had visited her on a day to day basis for some time. These facts indicate that the appellant possessed the peculiar knowledge, from June 1978, throughout his four appearances, of the existence, identity, location, and expected testimony of Miss Stewart. Additionally, their relationship, by the appellant's own admission, was more than mere friendship. Under these circumstances, we find that the trial court did not err in permitting the prosecuting attorney to comment on the availability of the witness.
Regarding the second complaint, the following portion of the record is applicable:
 "MR. BLACK: What does she get? She gets to come into court to three trials, which takes just as much of her time all three times, which is just as much dread on her part of coming down here.
 "MR. PARKER: If Your Honor please, I object to that as an improper argument and it's designed to prejudice and bias the jury against Charlie McMorris. There's no evidence as to what he's saying at this point.
"THE COURT: Overruled.
 "MR. PARKER: If Your Honor please, I object. I did not call her a liar. I think it's improper to say that I did call her a liar.
 "MR. BLACK: When you say she's colored her testimony and changed it to mislead the jury, if that's not calling somebody a liar I don't know what it is. "MR. PARKER: I object to this argument by Mr. Black.
"THE COURT: I'll overrule it.
 "MR. BLACK: Then she gets to come in here and testify — You figure out her testimony in this trial and the other two and I'll say you've come up to 10 hours of testimony.
"MR. PARKER: We object to his opinion about that.
"THE COURT: Overrule it.
. . . . . *Page 403 
 "MR. BLACK: One thing about this whole episode, she's not going to be able to forget it. It's going to wake her up at night in her nightmare.
 "MR. PARKER: We object to that. There's nothing in the evidence about it. It's an attempt on the part of the prosecutor to attempt and to bias the jury against Charlie McMorris. He's arguing something that's not in evidence.
"THE COURT: Overruled."
The appellant alleges the foregoing portion of the prosecutor's argument was a reference to the fact that the appellant is a black male, and the court did not instruct the jury that arguments are not evidence.
At the outset, we must frankly say that we fail to see in the above comments any direct or indirect reference concerning the appellant's race. Further, the appellant, during his cross-examination of the prosecutrix, attempted to impeach and discredit her testimony. The inference from such cross-examination was that the prosecutrix had testified falsely. Under these circumstances, we do not believe that the prosecuting attorney's comment was improper. Further, we note from the transcript of evidence that the trial court admonished the jury in the following language:
 "THE COURT: Ladies and gentlemen, let me say this: In arguing the case the lawyers may interpret the law as they see it or they may draw any conclusions that they can draw, any reasonable conclusions or any assumptions. What they say is not evidence. You, ultimately, will determine where the truth lies and what the facts are." [Emphasis added]
Consequently, we find that the appellant's contention is not supported by the record.
Also, it is our judgment that there was no prejudicial effect of a cumulative nature shown in the foregoing comments.
 VII
It is appellant's final contention that the trial court prematurely, and sua sponte, gave the jury an "Allen charge" prior to their deliberations. In addition, he says that the charge did not restate the burden of proof and placed undue pressure upon the jury to reach a verdict. The charge reads as follows.
 "I might say this: Some of you may have heard me say this once this week. There is not going to be a better jury selected in this case than sits here now. There's not going to be a smarter one next month or the month after. There's not going to be — the facts aren't going to be any different. The facts are not going to change. You're going to have the same lawyers, the same defendant. Both the State and the Defendant in this case want a verdict reached. So, I feel sure that all of you feel like that, if it's possible you'll reach a verdict. Are there any exceptions?
"MR. BLACK: No, sir.
 "MR. PARKER: Judge, I would just like to except to that last statement that the Court made.
 "THE COURT: If it's possible, you will reach a verdict?
 "MR. PARKER: No, sir, I mean the entire thing about the facts are going to be the same and all that.
"THE COURT: All right, I overrule."
The general rule in Alabama has been that it is not improper for the trial court to urge upon the jury the duty of attempting to reach an agreement or verdict as long as the judge does not suggest which way the verdict should be returned. Evans v. State, Ala.Cr.App., 338 So.2d 1033; Cook v.State, Ala.Cr.App., 333 So.2d 855, and cases cited therein. Whether such an instruction should be given to the jury is addressed to the sound discretion of the trial court. Hale v.U.S., 435 F.2d 737 (5th Cir.)
In the present case, the trial court did not threaten or coerce the jury to reach an agreement, therefore, we find no error in the trial court's instruction. See generally, Cross v.City of Decatur, Ala.Cr.App., 355 So.2d 405; Strickland v.State, Ala.Cr.App., 348 So.2d 1105. *Page 404 
 VIII
We have examined the evidence in this case and have found that the evidence was sufficient for the jury to have concluded that the appellant committed the act charged, therefore, the trial court properly refused appellant's requested charge and properly denied his motion for a new trial. Long v. State, Ala.Cr.App., 370 So.2d 354; George v. State, Ala.Cr.App.,362 So.2d 1327.
We have examined the record and transcript of evidence and find no error prejudicial to appellant, therefore the judgment of conviction by the Jefferson Circuit Court is affirmed.
AFFIRMED.
All the Judges concur.