ON APPLICATION FOR REHEARING
The opinion of this Court issued May 1, 1992, is hereby withdrawn. The following becomes the opinion of the Court.
Larry Earl Miller, the appellant and a habitual felony offender, was convicted of burglary in the first degree, kidnapping in the second degree, rape in the first degree, and robbery in the first degree. He was sentenced to life imprisonment for the kidnapping and to life without parole on the remaining three convictions. He raises five issues on this appeal from those convictions.
 I.
The appellant argues that his motion to suppress certain items of property seized from his person and from a residence should have been granted.
The crimes were committed during the night of August 29, 1990. Based on the victim's identification of her assailant, Enterprise Police Detective Cindy Dunaway obtained a warrant for the appellant's arrest on August 30, 1990. The warrant was executed that same morning at the residence of Lorene Scott, the appellant's ex-mother-in-law. A search of Mrs. Scott's residence was also conducted that morning.
At the time of his arrest, the appellant had been "staying" at Mrs. Scott's residence for "almost a month." R. 93. Mrs. *Page 490 
Scott testified that the appellant "didn't really have a room. I just let him sle[ep on a mattress] in there. I didn't have a bed in there at the time." R. 93.
At the hearing on the motion to suppress, Detective Dunaway and Captain William Moore testified to the effect that no threat, coercion, or intimidation was employed to obtain Mrs. Scott's consent to search. Their testimony was corroborated by Officer Michael Lolley, who testified to that same effect at trial. However, Mrs. Scott testified at the hearing on the motion to suppress that the police entered her residence without her knowledge and without her permission while she was outside her residence in the yard; that she was scared; and that they told her that "if we don't get our search now, we're going to anyway." (R. 91, 96.) In an affidavit, Mrs. Scott stated that a police officer "stated that I could let them search and look for [the appellant] in my home or if I refused he would get a search warrant and do it anyway." C.R. 32.
In denying the motion to suppress, the trial judge made the following findings:
 "These are the findings of fact by the Court. First of all, the Court finds that on August 30, 1990, and armed with an arrest warrant for burglary in the first degree, law enforcement officers, primarily of the City of Enterprise, Alabama, went to the residence — the home of Mrs. Lorene Scott for the purposes of arrest — executing an arrest warrant on the person of Larry Earl Miller. That law enforcement officers had information to believe that Larry Earl Miller was staying at and located at Mrs. Scott's home. The Court further finds that the defendant, Mr. Miller, had no room at this house. That he slept on a mattress at this house. That he is a former son-in-law of Mrs. Scott. That he and Mrs. Scott's daughter are no longer married and haven't — had not been prior — immediately prior to August 30, 1990. That law enforcement officers knocked on the door. Of course, I understand that testimony is conflicting here, but these are the findings of the Court. That the law enforcement officer knocked on the door. That the door was opened by Mrs. Scott, the owner of the premises. And I'll back up. She, Mrs. Scott, owned the premises with her husband, who was not present at the time law enforcement arrived; he had left earlier that morning, as the testimony the Court finds is also fact. That Mrs. Scott was present with two small children. That law enforcement officers advised Mrs. Scott as to their purposes on the premises. That Mrs. Scott invited them in and as a result of no threat, no coercion, no duress, Mrs. Scott gave them permission, and as she stated, to go right ahead and search. And the Court finds that it was not — that that consent was not the result of threat, coercion or duress. Sure, that law enforcement officers had pistols on their person, but the testimony is and the Court finds that none of them had drawn their pistols or made any overt threat of harm to Mrs. Scott. It's not duress that law enforcement officers may have told Mrs. Scott that they could obtain a search warrant to search the premises. That's not enough to set aside any search due to coercion. Law enforcement officers found . . . Mr. Miller, the defendant, the person that they were looking for and had an arrest warrant for, in the hall closet of Mrs. Scott's premises. That Mrs. Scott told law enforcement that he was not present; that she had not seen him, and she testified and the Court finds that she, Mrs. Scott, did not even know that he was, in fact, present. That the defendant, Mr. Miller, had on a camouflage pants; it's conflicting as to whether or not he had a shirt on. Law enforcement officers placed Mr. [Miller] under arrest and took him and put him on a bed for security reasons. That they obtained — first of all, when they patted Mr. Miller down, they found a ring. It's been marked as State's Exhibit D and has been entered into evidence. Again, the Court finds that there is a reasonable probability that the ring taken from the defendant's person is the one and the same ring as entered into evidence as State's Exhibit D and that it has not been *Page 491 
substantially — it is not substantially different from what the condition that it was in when it was taken from the defendant's person.
 "The Court also finds that as to State's [Exhibits] E, F, and G, they being — E being a watch, a Gruen watch, silver colored. F being a tiffany diamond ring. And G being a dangling pearl ring; it's been described as being that. That Mrs. Scott, the Court finds, had given law enforcement officers permission to look for other properties and to conduct their search and that law enforcement officers found E, the watch, F, the diamond ring and G, the dangling pearl earring pursuant to their lawful search, by consent, of the premises. The Court also finds that the search was in all ways lawful and proper. That any evidence found was found incident to a consent search by a person having authority and standing to consent to that search and/or incident to a lawful arrest of the Defendant." R. 104-08.[1]
The trial judge's determination of the consent issue necessarily depended upon whether he believed either the testimony of Mrs. Scott or that of the police officers.
 "It is well settled that the 'weight and credibility to be attached to the testimony of witnesses at a suppression hearing is a question for the trial judge.' . . . Further, a trial court's ruling based upon conflicting evidence given at a suppression hearing is binding on this Court, . . . and is not to be reversed absent a clear abuse of discretion."
Jackson v. State, 589 So.2d 781, 784 (Ala.Cr.App. 1991).
The trial judge's findings of facts are reasonable and are supported by the record. "If the trial court makes findings of fact [on a motion to suppress], which is the better practice, the appellate court is required to accept them unless they are clearly erroneous." Kaercher v. State, 554 So.2d 1143,1150 (Ala.Cr.App.), cert. denied, 554 So.2d 1152 (Ala. 1989) (criticizing lack of adequate trial record). See alsoUnited States v. Hummer, 916 F.2d 186, 189 (4th Cir. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 1608,113 L.Ed.2d 670 (1991).
Initially, we note that it is not disputed that Mrs. Scott, the owner of the residence, had the authority to consent to a search of the premises. See United States v. Matlock,415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 993 n. 7, 39 L.Ed.2d 242
(1974). "Consent to a search must be knowingly, intelligently, and freely given." Ex parte Wilson, 571 So.2d 1251,1255 (Ala. 1990). "[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." Florida v.Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324,75 L.Ed.2d 229 (1983). See also Florida v. Bostick, ___ U.S. ___,111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). "[T]he question whether a consent to search was in fact 'voluntary' or was a product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."Schneckloth v. Bustamonte, 412 U.S. 218, 227,93 S.Ct. 2041, 2047-48, 36 L.Ed.2d 854 (1973). See United States v.Chaidez, 906 F.2d 377, 380-81 (8th Cir. 1990); UnitedStates v. Lopez, 911 F.2d 1006, 1010 (5th Cir. 1990) for a list of specific factors to be considered in the totality of circumstances. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Florida v. Jimeno, ___ U.S. ___, 111 S.Ct. 1801, 1803-04, 114 L.Ed.2d 297 (1991).
This Court notes that the trial judge did not find as a matter of fact that any officer had threatened to obtain a search warrant if Mrs. Scott did not consent to a search of her residence. However, the *Page 492 
threat of a law enforcement officer to obtain a search warrant "does not necessarily constitute a coercive factor negating consent" to search. United States v. Vasquez,638 F.2d 507, 528-29 (2d Cir. 1980) e(involving multiple defendants and multiple issues), cert. denied, 450 U.S. 970, 101 S.Ct. 1490,67 L.Ed.2d 620 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135,454 U.S. 975, 102 S.Ct. 528, 70 L.Ed.2d 396 (1981) (all denials of certiorari relate to other defendants and other issues). "[T]he statement of the officer that he would obtain a search warrant if consent were not given . . . is . . . not conclusive as a matter of law." United States v. Agosto, 502 F.2d 612,614 (9th Cir. 1974). "[C]onsent is not likely to be held invalid where an officer tells a defendant that he could obtain a search warrant if the officer had probable cause upon which a warrant could issue." United States v. Kaplan,895 F.2d 618, 622 (9th Cir. 1990). See also Daniels v.State, 534 So.2d 628, 654-55 (Ala.Cr.App. 1985), affirmed,534 So.2d 656 (Ala. 1986), cert. denied, 479 U.S. 1040,107 S.Ct. 898, 93 L.Ed.2d 850 (1987); 3 W. LaFave, Search andSeizure § 8.2(c) (2d ed. 1987).
Here, as in Daniels, 534 So.2d at 654, "the trial court [was] in the best position to determine consent or the lack thereof." That determination of consent and voluntariness is supported by the weight of the evidence.
 II.
The appellant asserts that the prosecution failed to establish a proper chain of custody for the admission into evidence of the opal ring found in the pocket of the appellant's pants. On appeal, no issue is taken with regard to the admission of the other items of jewelry discovered in the search.
The controlling principles were recently set forth in Exparte Holton, 590 So.2d 918, 919-20 (Ala. 1991).
 "This opinion set forth an analysis to be followed in deciding whether a proper chain of custody has been shown. We have held that the State must establish a chain of custody without breaks in order to lay a sufficient predicate for admission of evidence. . . . Proof of this unbroken chain of custody is required in order to establish sufficient identification of the item and continuity of possession, so as to assure the authenticity of the item. . . . In order to establish a proper chain, the State must show to a 'reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.' . . . Because the proponent of the item of demonstrative evidence has the burden of showing this reasonable probability, we require that the proof be shown on the record with regard to the various elements discussed below.
 "The chain of custody is composed of 'links.' A 'link' is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link's possession of the item: '(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.' . ..
 "If the State, or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a 'missing' link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the 'link,' as to one or more criteria or as to one or more links, the result is a 'weak' link. When the link is 'weak,' a question of credibility and weight is presented, not one of admissibility."
The evidence in this case shows that Lieutenant Mike Lolley removed an opal ring (State's exhibit D) from the pocket of the appellant's pants on August 30, 1990, at the residence of Mrs. Scott. R. 381. He handed this ring to Detective Dunaway, *Page 493 
"who was standing beside [him]." R. 382. Also found at Mrs. Scott's residence were a diamond ring, a watch, and an earring allegedly taken from the victim.
Dunaway secured the opal ring and other jewelry in her file cabinet until it was identified by the victim. R. 42. On August 30, 1990, at approximately 10:30, the victim identified all of this property — the two rings, the earring, and the watch — as belonging to her. R. 37. After photographing the four pieces of jewelry, Detective Dunaway placed all of the jewelry into an envelope (State's Exhibit C. R. 43), sealed the envelope, and delivered it to Sergeant Breed, the "case agent." R. 44. Apparently that envelope was placed inside another envelope (State's Exhibit B, R. 59).
Prior to trial, on February 25, 1991, defense counsel sought to inspect the jewelry that had been seized at the property room of the police department. However, the opal ring could not be found.[2] At that time, Detective Dunaway informed defense counsel that the opal ring had been returned to the victim. R. 31. At the suppression hearing, Detective Dunaway testified: "At that time when we got all this out, we didn't find the other envelope. I didn't know where it was and they say that they thought it had been returned to [the victim]." R. 33.
The opal ring was later discovered in the evidence locker. Detective Dunaway testified that the ring "was in the evidence locker and had fallen on another shelf." R. 34-35. She "found it on the shelf." R. 40. Evidence custodian Captain William Moore found the envelope "on the middle shelf where we keep jewelry and tapes with the cassette tapes, which are all packaged in envelopes like these." R. 81. It "was all the way at the back, underneath a bunch of stuff. And the other bags were out in the very front." R. 81.
At trial, the victim positively identified the opal ring: "That is the ring that I was wearing and that he took off my finger." R. 239. Detectives Dunaway and Lolley also positively identified the opal ring.
The trial judge ruled that the opal ring was admissible:
 "For the record, this witness has testified, in a nutshell, there this was, in fact, the ring that was taken from the Defendant's pocket on the occasion made the basis of this suit. She's identified it. She's further stated that the ring is in substantially the same condition or shape that it was in when it was taken into law enforcement's possession. It is, therefore, admissible." R. 47.
See also R. 63, 67.
Obviously, the prosecution failed to lay a proper predicate for the admission of the ring under the case ofHolton, supra. Although the evidence shows that Lolley gave the ring to Dunaway who gave it to Breed, there was no testimony as to what Breed did with the ring and how Moore came into possession of that ring. Undisputedly, underHolton, there is a "missing link" in the chain of custody.
However, after the release of its opinion in Holton, the Alabama Supreme Court decided Ex parte Jones,592 So.2d 210, 212 (Ala. 1991), wherein that Court held: "A gun is properly admitted into evidence when it is identified at trial as being the weapon used in the commission of the offense."
 " ' "To warrant the reception of an object in evidence against an objection that an unbroken chain of custody has not been shown, it is not necessary that it be proved to an absolute certainty, but only to a reasonable probability, that the object is the same as, and not substantially different from, the object as it existed at the commencement of the chain." '
Laws v. State, 562 So.2d 305, 306 (Ala.Cr.App. 1990).
 " ' "The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with *Page 494 
the evidence. . . . 'The evidence need not negate the most remote possibility of substitution, alteration, or tampering with the evidence, but rather must prove to a reasonable probability that the item is the same as, and not substantially different from, the object as it existed at the beginning of the chain.' . . . (emphasis supplied)." '
Williams v. State, 505 So.2d 1252, 1253 (Ala.Cr.App. 1986), aff'd, 505 So.2d 1254. 1255 (Ala. 1987)."
Jones, 592 So.2d at 211-12. This Court finds that the opal ring was properly admitted into evidence, despite the broken chain of custody, because the ring was positively identified at trial and because there was no reasonable probability that the ring introduced at trial was different from the ring discovered in the appellant's pocket.
We recognize that the prosecution failed to prove specifically that the ring was a one-of-a-kind item or that it contained any distinctive markings. Detective Dunaway admitted such on cross-examination. R. 64-65.
 "The simplest method of identifying real evidence is by proving that it is a readily identifiable item which the witness recognizes. This method involves the use of direct evidence. The issue is the item's identity, and the witness testifies that he recognizes the item as the article in question. A line of questioning using this method can be very brief. First, the proponent asks the witness whether he can recognize the item. Then the proponent asks the witness to specify the physical characteristics the witness is relying upon to identify the item.
". . . .
 "It is submitted that the most realistic method of analyzing identification problems lies in a combination of the opinion and probabilistic methods. The courts which have treated the witness' statement of identification as an expression of opinion are correct. Since the court must test the basis for the opinion, the witness should be required to specify the physical characteristics he relies upon in making the identification. The judge should then apply a common-sense, probabilistic test: Is the combination of physical characteristics the witness has testified to sufficiently unusual to make it more likely than not that the item possessing that combination of characteristics is a unique, singular item?"
Imwinklereid, The Identification of Original, RealEvidence, 61 Mil.L.Rev. 145, 147-48, 153 (1973) (footnotes omitted), cited in Holton, 590 So.2d at 920. See alsoPardue v. State, 571 So.2d 320, 329 (Ala.Cr.App. 1989) ("When the condition of the evidence is not at issue, however, it is not always necessary to establish a chain of custody"), reversed on other grounds, 571 So.2d 333 (Ala. 1990).
Here, the uniqueness of the ring is established not because of any peculiar or particular characteristic of that ring, but because that ring was found in the appellant's possession in conjunction with three other specific items of jewelry — a watch, another ring, and an earring — which the victim positively identified as belonging to her, both the day after the crime was committed, following the appellant's arrest (R. 37), and at trial. (R. 239 and 247). Under the facts presented here, the probability that these four particular items of jewelry would be found in another residence shortly after they had been stolen satisfies any "reasonable probability" test and authorizes the admission of the ring into evidence.
 III.
The appellant contends that the trial court abused its discretion in denying his motion for a continuance.
The appellant maintained a defense of alibi. He contended that, on the night of the crime, he was in the Boll Weevil Motel; that he registered there under the name of "John Smith"; and that the motel clerk who was on duty that night, Harshad Patel, a "legal alien" (R. 134), might be able identify him. Mr. Harshad Patel worked at the Boll Weevil Motel for two weeks while the owner, Mr. Yogesh Patel (no relation), was on vacation. R. 571. *Page 495 
On March 19, 1991, a jury was selected to hear the appellant's case. However, before the jury was sworn, defense counsel informed the trial judge that Mr. Hashad Patel had temporarily returned to India because of some sickness in the family. R. 119. Because defense counsel had been recently appointed[3] and due the lengthy mandatory sentences involved in this case should the appellant be convicted, the trial judge granted a mistrial on motion of the appellant and continued the case until the next term of court. R. 137-39, 140. The trial judge observed: "[D]efense counsel has not been in this case very long so the Court cannot say that — anything about any dilatory tactics on their part by any means." R. 138. However, the trial judge noted:
 "I know counsel for the defense to be very honest and very capable counsel. And I would say, had they been in this case from the very beginning, I would be very reluctant to grant a continuance because, in my opinion, since this Defendant's been arraigned [October 30, 1990], Defendant has had adequate time to effectuate a subpoena or it would appear just out of common knowledge that Defendant would know where he was staying on the night of the 29th and something so important as an alibi would certainly be within the knowledge of the Defendant and easily — efforts easily made to discover and to effectuate proof of where the Defendant was a that particular time." R. 137-38.
On March 25, 1991, the same day the motion was filed, the trial judge granted the appellant's motion for funds to hire an expert in handwriting analysis.
The appellant's case was called for trial again on May 6, 1991. On May 9, after the State had presented its case-in-chief and rested, defense counsel informed the trial judge, for the first time, that Mr. Harshad Patel had not appeared for court. Defense counsel stated: "I feel like we can proceed without him, but I do want the Court to know he is a witness of value to the defense." R. 559. The trial judge, on his own motion, then offered to issue a writ of attachment of Mr. Patel.
After a recess, defense counsel represented to the trial court that, just the night before, Yogesh Patel, the owner of the motel, had informed Harshad Patel, the missing witness, that the trial was still going on. Defense counsel represented that the missing witness told Mr. Yogesh Patel that "he doesn't have a car, doesn't have a way to get here, he didn't know when he was supposed to be here." R. 560. Counsel also indicated to the court that the missing witness had been served with a subpoena on the May 7 to appear on May 6. When the trial judge asked, "He is an essential witness to the defense?" defense counsel responded, "The defendant feels he is an essential witness to the defense." R. 561. The trial judge issued a writ of attachment for the witness and ordered someone to travel to Tuskegee, Alabama, where the witness resided, and to "[g]et him here as quick as we can get him here." R. 562.
The trial continued in the absence of the witness. The motel registration card for "John Smith" was admitted into evidence. R. 574. A forensic document examiner testified to the effect that handwriting on the name and address portion of that card belonged to the appellant.
On May 9, 1991, before the defense presented its last witness, Bruce DeVane, chief investigator for the district attorney's office, testified, out of the presence of the jury, that he had assisted the defense in attempting to locate the missing witness. DeVane testified that he had contacted another investigator in Troy, Alabama, and had telefaxed him a copy of the attachment. That investigator had then gone to the Macon Motel and talked with Mr. Patel's wife who told the investigator that her husband had just (approximately five minutes earlier) left in his car for Opelika, Alabama, to shop. The investigator drove *Page 496 
about half way to Auburn without locating the vehicle described by Mrs. Patel. Mrs. Patel informed the investigator that her husband had received a subpoena to appear in court on May 8, 1991.
The trial judge ruled:
 "I am going to rule that every effort has been made to get this witness. I issued a writ of attachment for him. They cannot find him and I don't see how we can delay the trial any more. The jury is present and ready to go. I am going to overrule the defense objection and order the trial to proceed without the witness." R. 596.
 "A motion for a continuance is addressed to the discretion of the court and the court's ruling on it will not be disturbed unless there is an abuse of discretion. . . . If the following principles are satisfied, a trial court should grant a motion for continuance on the ground that a witness or evidence is absent: (1) the expected evidence must be material and competent; (2) there must be a probability that the evidence will be forthcoming if the case is continued; and (3) the moving party must have exercised due diligence to secure the evidence."
Ex parte Saranthus, 501 So.2d 1256, 1257 (Ala. 1986). Here, although it appears that everyone did everything possible to secure the witness's presence at trial, defense counsel could not even represent to the court that the witness would positively identify the appellant as having been the "John Smith" who registered at the motel. There was no showing that defense counsel had even spoken with the missing witness although there is an inference that someone had spoken to the witness for defense counsel.[4] Most significantly, there was no representation as to when or even if the witness's attendance could be secured.
"In this jurisdiction, it has been 'often held that continuances are not favored and that a trial court's denial of a motion for continuance will be upset only when a palpable or gross abuse of discretion has been shown.' " Scullin v.Cameron, 518 So.2d 695, 698 (Ala. 1987). Here, there has been no showing of abuse.
 IV.
In connection with Part III, the appellant asserts that, in his closing argument, the prosecutor improperly commented on the missing witness and that no one had testified that the appellant was at the motel on the night in question. On appeal the appellant asserts that this was a comment on his failure to testify. However, at trial the objection was based on the fact that "we couldn't have that witness here, that we were ordered to proceed on, and now he is arguing that nobody is here to put him in that motel room." R. 603. "The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial." Ex parte Frith, 526 So.2d 880, 882 (Ala. 1987). "The plain error doctrine applies only to death cases."Calhoun v. State, 530 So.2d 259, 262 (Ala.Cr.App. 1988). Furthermore, "[a] comment by the prosecutor which refers to the defendant's failure to put on evidence is not a comment on the defendant's failure to testify unless the defendant himself is the only one who can contradict or deny the evidence." Ashurst v. State, 462 So.2d 999, 1010
(Ala.Cr.App. 1984). Finally, we note that "[w]hether a witness is available or accessible within the meaning of the rule prohibiting comment upon the failure of a party to call or examine a witness does not mean availability or accessibility for subpoena purposes, but rather a particular party's superior knowledge of the existence, identity, and expected testimony of the witness." McMorris v. State, 394 So.2d 392, 402
(Ala.Cr.App. 1980), cert. denied, 394 So.2d 404 (Ala.), cert. denied, 452 U.S. 972, 101 S.Ct. 3127, 69 L.Ed.2d 983 (1981). *Page 497 
 V.
The appellant contends that his motion for a change of venue should have been granted on the basis of alleged prejudicial pretrial publicity. This motion was based on the contents of three newspaper articles which appeared on September 5, 1990; March 20, 1991; and May 1, 1991.
The legal principles governing this issue are set out inEx parte Fowler, 574 So.2d 745, 747-48 (Ala. 1990).
During the hearing on the motion for change of venue, the jury venire was questioned about pretrial publicity and personal knowledge of the facts of this case. Initially, only two veniremembers responded: Betty Groom indicated that she had "reported on what was included in I believe in the indictment," (R. 191) and Herbert Anderson stated that he had "read some articles," (R. 192). Subsequently, other members indicated that they had read an article about the appellant: Robbie N. Medley, Betty Groom, Bobby Joe Flowers, Jr., Judith Elam, (R. 194) Herbert Barr, Lanell Hundley, (R. 195). None of those veniremembers indicated that they had formed an opinion about the appellant's guilt or innocence. Veniremember Anderson indicated that it would require evidence to show that the appellant did not commit the charged offenses and veniremember Hundley indicated that she "just d[id]n't know" and that she "didn't know how I feel about it. I don't know enough facts to make an opinion." R. 196.
Defense counsel challenged four veniremembers for cause on the basis of pretrial publicity or prior knowledge. R. 215-17. The trial judge granted only two of those four challenges for cause. There were 126 members on the venire. R. 220.
The appellant has totally failed "to establish that prejudicial pretrial publicity ha[d] so saturated [Coffee] County as to have a probable prejudicial impact on the prospective jurors there, thus rendering the trial setting inherently suspect." Ex parte Fowler,574 So.2d at 747. Although the pretrial publicity was prejudicial to the extent that it connected the appellant with other criminal offenses and one similar case, it was not extensive. Moreover, there was no evidence that that publicity tainted the community or the jury.
 VI.
We summarily reject the appellant's argument that the evidence was insufficient to sustain the conviction. Our review of the record convinces this Court that, despite discrepancies between the victim's initial description of her assailant and the appellant's physical features, the evidence against the appellant was devastating and the conclusion of his guilt was inescapable. Inconsistencies between the victim's description of the assailant and the defendant go to the credibility of the witness and present a question for the jury. Currin v.State, 535 So.2d 221, 222 (Ala.Cr.App.), cert. denied,535 So.2d 225 (Ala. 1988); Cochran v. State,500 So.2d 1161, 1170 (Ala.Cr.App. 1984), affirmed in part, reversed in part on other grounds, 500 So.2d 1179 (Ala. 1985); Cox v.State, 50 Ala. App. 339, 341, 279 So.2d 143, 144 (1973). Such inconsistencies affect the weight rather than the sufficiency of the evidence. See Johnson v. State,555 So.2d 818, 819-20 (Ala.Cr.App. 1989).
The victim positively identified the appellant's photograph after viewing 40 photographs. One piece of jewelry taken from the victim was found both on the person of the appellant; three others were found in the residence where he had been living. The appellant's palmprints were on the victim's automobile. The appellant's motion for a directed verdict of acquittal was properly denied.
ORIGINAL OPINION WITHDRAWN;
OPINION SUBSTITUTED;
MOTION DENIED;
APPLICATION FOR REHEARING OVERRULED;
AFFIRMED.
All Judges concur.
[1] We commend the trial judge for making findings of facts on the record. We encourage other judges to do likewise.
[2] It was not argued at trial that all of the jewelry was missing on this occasion. However, it is not clear from the record exactly what was missing: just the opal ring, the envelope containing all the jewelry, or an envelope containing just the opal ring.
[3] The record shows that the two attorneys who represented the appellant at trial were appointed on February 1, 1991. C.R. 10.
[4] During the discussion of the missing witness, defense counsel objected to the prosecutor's proffer of what that witness had told Mike Jared: "I object to what he understands Mr. Mike Jared to have done. He did this in the investigation of this case. It is within the privilege." R. 561. After defense counsel objected to the prosecutor's closing argument, the prosecutor stated, in argument to the trial judge: "Had their witness been available I think Mike would have to tell you that testimony would be that he couldn't identify the picture of the defendant." R. 602-03. *Page 498